Robert W. Dickerson, Jr. (SBN 089367)
E-mail: rdickerson@comp-techlaw.com
Competition & Technology Law Group LLP
11400 West Olympic Blvd., Suite 200
Los Angeles, CA 90064
Tel: 310.774.2337
Fax: 213.799.3642

*Additional Counsel on Signature Page*

Attorneys for Plaintiff
RUMBLE CANADA INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUMBLE CANADA INC., | Case No. |
| Plaintiff, | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF DUE TO ANTITRUST VIOLATIONS RELATING TO AD TECH** |
| v. | |
| GOOGLE LLC and ALPHABET, INC., | |
| Defendants. | |

For its complaint against Defendants and each of them, plaintiff Rumble Canada Inc. ("Rumble") alleges based upon personal knowledge and information and belief as follows:

## I.    INTRODUCTION

1. This complaint asserts claims and seeks damages and injunctive relief that are entirely separate and distinct from that being sought in the currently pending case against Google (*Rumble Inc. v. Google LLC*, 4:21-CV-00229-HSG (N.D. Cal.)).

2. That case relates primarily to Google's self-preferencing its wholly-

owned vertical YouTube in Google search results over links to the searched-for videos on rumble.com (and other online video platforms), and various agreements that Google entered into with third parties that allowed Google to dictate that the YouTube mobile app must be pre-installed on various smart devices, that the YouTube app must be given prominent placement on the smart device, and that the YouTube app cannot be deleted by the end user of the device.

3.     This Complaint, in contrast, asserts claims and seeks relief of the type being sought in the pending MDL matter, *In re Google Advertising Litigation*, Case No. 1:21-md-03010-PKC ("MDL Case").  Indeed, allegations and claims in this Complaint closely mirror several of those made in plaintiffs' complaints in the MDL Case.

4.     Rumble brings this action alleging Google's violations under Sections 1 and 2 of the Sherman Act, (15 U.S.C. §§ 1 and 2), and Sections 4 and 15 of the Clayton Act (15 U.S.C. §§ 4 and 15), for monetary damages and injunctive relief resulting from Google's anti-competitive conduct relating to online advertising (generally referred to as "Ad Tech").

## II.     THE PARTIES, JURISDICTION, VENUE, AND COMMERCE

5.     Plaintiff Rumble is a Canadian corporation with a principal place of business at 218 Adelaide Street West, Suite 400, Toronto, Ontario, M5H1W7.

6.     Defendant Google LLC is a limited liability company organized and existing under the laws of the state of Delaware, and is headquartered in Mountain View, California within this judicial district.  The sole member of Google LLC is believed to be XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California.

7.     Defendant Google LLC is wholly owned by defendant Alphabet Inc., a publicly traded company incorporated and existing under the laws of the state of Delaware and headquartered in Mountain View, California.   Hereinafter, defendants

Google LLC and Alphabet Inc. will be jointly referred to as "Google" or "Defendants."

8.      Google engages in, and its activities substantially affect, interstate trade and commerce.  Google provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally.  Defendants are thus engaged in interstate commerce.

9.      This Court has personal jurisdiction over Defendants as they are both headquartered and do business in this District.

10.     This Court has jurisdiction over this action under Sections 1, 2, and 4 of the Sherman Act (15 U.S.C. §§ 1, 2 & 4); Section 16 of the Clayton Act (15 U.S.C. § 26); and under 28 U.S.C. §§ 1331 and 1337.

11.     Venue is proper in this District under Section 22 of the Clayton Act, (15 U.S.C. § 22), and under 28 U.S.C. § 1391 because Defendants transact business and their headquarters are located within this District.

### III.   OVERVIEW OF ONLINE ADVERTISING

12.     Before the internet created an entirely new ecosystem for the manner in which content can be published and consumed, content was communicated to consumers in various ways such as television, radio, newspapers, magazines and the like.  Advertisements that accompanied pre-internet content were purchased in traditional transactions in which the person or entity wanting to place an advertisement would either directly or through an intermediary (*e.g.*, an ad agency) negotiate with the publisher as to placement and price, among other aspects of the deal.  *See, e.g., https://www.alamy.com/blog/advertising-ages-internet* for a brief history of advertising and the evolution to online advertising.

13.     The internet has not only revolutionized the way people consume content, but has also revolutionized the manner, mode and types of advertisements that companies can purchase to reach consumers.  Image-based ads on the internet

(called "display ads"), as well as audio and video ads in the online ecosystem have largely supplanted their traditional print, radio, and television counterparts.  In addition, the internet has led to completely new advertising formats, including targeted text-based ads on search engines, shareable ads on social media, and specialized ads that are published and available in mobile phone applications.

14.     The pre-internet traditional advertisements were intended primarily to "sell" the goods and/or services being advertised, and there was little if any information about the buyer of the product or service being sold that the publisher, or the advertiser, could obtain.  Today, however, while internet advertising is also intended to "sell', it can also create a "relationship" between the seller and the buyer, including providing to the seller (and for example, Google), important information about the likes, dislikes, interests, and purchasing characteristics of the searcher and/or buyer.

15.     Inevitably, with the evolution to internet-based advertising also came online bartering for the advertising to be displayed before, during, after and alongside the content being displayed.  Google's monopoly in online-search allowed it to dominate other areas of the internet ecosystem, including online advertising.  Indeed, Google has been at the center of the online advertising markets, and through its dominance and anti-competitive conduct as described below, Google has been able to garner a monopolist's share of the advertising markets, and with it, a monopolist's profits at the expense of Rumble and its content creators, of consumers and of competition.   In so doing, Google has significantly reduced the amount of ad-revenue that publishers of online content and affiliated advertising such as Rumble have received.  Rumble's damages are immense, believed to amount to over $1 billion U.S., before trebling.

///

///

///

## IV. PLAINTIFF RUMBLE CANADA INC. AND THE EFFECT OF GOOGLE's CONDUCT ON ITS BUSINESS

16.     Since 2013, Rumble has operated an online video platform whose founding business model has been premised upon helping the "little guy/gal" video content creators monetize their videos.  Video content creators upload their copyright-protected videos to the Rumble platform (rumble.com or its mobile app). Rumble in turn makes these videos ("Rumble Videos") available under license to other companies who have websites or other social media sites, and who want to make those videos available to visitors to their sites in order to generate advertising revenue.  Rumble is thus a "publisher" of online content for which Rumble (and its content creators) receive advertising revenue from the advertisements that are made available to viewers of the published content.

17.     Because of Google's long-standing dominance in online search, Rumble (like other video platforms) was required to syndicate its Rumble Videos to YouTube in order to attempt to survive, let alone compete.

18.     The quality of Rumble's platform and content is high.  Since rumble.com launched in 2013, Rumble Videos have been viewed well over 10 billion times worldwide just on YouTube alone (according to Google/YouTube's Analytics).

19.     Rumble's success, however, has been far less than it could and should have been as a direct result of Google's anticompetitive, exclusionary, and monopolistic behavior. This has coincided with Google's acquisition and unlawful maintenance of monopoly power in the search engine market, as detailed in the pending case *United States of America et. al. v. Google LLC*, Case 1:20-cv-03010, Document No. 1, 10/20/2020 (D.D.C.) ("the DOJ Complaint").  Building off its monopoly power in search, Google also has been able unlawfully to obtain and maintain a monopoly in the online Ad Tech markets, and to collect a supra-competitive share of the ad revenue that is generated through Google's Ad Tech

1   tools.

2       20.    Google's conduct in this regard has not only harmed Rumble, but also

3   its content creators and other similarly situated online video platforms who have

4   been deprived of the views, users, uploads, traffic brand awareness, and ad-revenue

5   needed to survive and prosper. This has injured both competition and consumers

6   throughout the United States and the world, who have lost out on the increased

7   output and even higher quality that would be expected from a truly competitive

8   marketplace.  Google's game plan has been (and continues to be) to drive out

9   competitors by whatever means required and regardless of their illegality.

10       21.    It is notable that Google has faced scrutiny, and its anticompetitive

11   conduct condemned, in jurisdictions outside the U.S. as well, where government

12   agencies have investigated Google's conduct and found it to be anticompetitive in

13   several ways.  For example, the U.K. Competition and Markets Authority identified

14   Google's misconduct and the harm to publishers, but concluded it did not have

15   appropriate authority to implement a remedy. S*ee Online Platforms and Digital*

16   *Advertising Market Study Final Report* at 20, 60, 394-406 (July 1, 2020) ("Google's

17   strong position at each level of the intermediation value chain creates clear conflicts

18   of interest, as it has the ability and incentive to exploit its position on both sides of a

19   transaction to favour its own sources of supply and demand.").  Likewise, the

20   Australian Competition and Consumer Commission identified Google's misconduct

21   and the harm to publishers, and is prescribing compensation and a code of conduct

22   to remedy some of Google's practices. *See Digital Advertising Services Inquiry*

23   *Interim Report* (Dec. 2020). The U.S. House Antitrust Subcommittee studied the

24   conduct of Google and other platforms, and found that Google is harming "the free

25   and diverse press" and endangering "political and economic liberty." *Final Report*

26   *and Recommendations, Investigation of Competition in Digital Markets,* at 57-77,

27   206-11 (Apr. 15, 2021).

28       22.    As related to Ad Tech, Google is an advertising company that makes a

massive amount of money from online advertising, such as image-based ads called "display ads."  In many ways, the market for display ads resembles other financial markets.  Publishers and advertisers trade display ad inventory through brokers and on electronic exchanges and networks at incredible speed.  As of today, Google is at the pinnacle of power in media and advertising, generating over $150 billion annually in revenue with immense profit margins, almost all from advertising revenue it receives, including from all of its vertically owned platforms and products.

23.    Google's advertising apparatus extends to the relatively new internet-based ad exchanges and brokers through which video display ads (among other types of advertisements) are bought and sold.  Indeed, nearly all of today's online publishers depend on just one company, Google, as their "middleman" to sell their online display ad space in "ad exchanges," (*i.e.*, the centralized electronic trading venues where, for example, display ads are bought and sold).  In addition to representing both the buyers and the sellers of online display advertising (including those displayed with online video content), Google also operates the largest ad exchange, AdX.

24.    Despite Google's public statements to the contrary, Google did not acquire its monopoly power through excellence in the marketplace or innovations in its services alone.  While Google claims it is just trying to make the world a better place and to provide users of the internet with the best possible products, its real goal has been to extract ill-gotten monopoly rents by engaging in flagrantly anticompetitive conduct.

25.    In reality, Google exploits significant conflicts of interest that stem from its multiple roles in this electronically traded marketplace. As a result, it is able to pocket a supra-competitive portion of every advertising dollar that passes through the Ad Tech markets it controls, ad-revenue that rightly should have passed through to publishers like Rumble and its content creators.

26.    Google saw in the mid-2000s the potential for controlling the Ad Tech

markets and for massive monopoly profits, and it set out to acquire them by whatever means necessary.

27.    In 2008 Google acquired DoubleClick, which at the time was the leading provider of ad server tools.  After acquiring DoubleClick, Google monopolized the publisher ad server and exchange markets by engaging in unlawful tactics.  For example, Google used its power in other markets, including search, to require publishers to license Google's ad server and to transact business through Google's exchange in order to be able to do business in those other markets in which Google possessed monopoly power.  Google was also able to demand that it represent the buy-side of the transaction (*i.e.*, advertisers), where it extracted one fee, as well as the sell-side of the transaction (*i.e.*, publishers), where it extracted a second fee.  Google was also able to force transactions to clear in its exchange, where it extracted a third, even larger, fee.  For Google, this was a virtual gold mine, albeit an ill-gotten one.

28.    Executing on its game plan, Google successfully monopolized the publisher ad server market and grew its ad exchange to prominence, despite having entered those two markets much later than competitors.  With its stranglehold on publisher ad servers, Google then proceeded to further foreclose publishers' ability to trade in non-Google exchanges.  Because of its dominance, Google was able to impose a one-exchange-rule on publishers like Rumble, barring them from routing inventory to more than one exchange at a time.

29.    Google's ad server also blocked competition from non-Google exchanges through a program called Dynamic Allocation and represented to publishers (like Rumble) that Dynamic Allocation would materially increase their revenues.  It now appears, however, that Google's real game plan with Dynamic Allocation was to empower its exchange to acquire the publishers' best inventory at the expense of publishers' best interests.

30.    A new type of advertising protocol called "header bidding" was

Complaint

developed, in part to inject some competition back into Ad Tech.  Publishers such as Rumble could use header bidding to simultaneously route their ad inventory to multiple exchanges in order to solicit the highest bid for their inventory.  Header bidding promised to bypass Google's strangle-hold on the online exchange market. Perhaps for this reason, header bidding became very popular very quickly. According to some reports, by 2016 about 70 percent of major online publishers in the United States had adopted and were using header bidding.  Advertisers also used header bidding because it helped them purchase the same ad inventory for the lowest price, which is the hallmark of honest competition in any market.

31.     Google soon realized that header bidding substantially threatened its exchange's ability to demand a very large portion of the ad revenue on all online advertising transactions.  Google's bottom line was at risk.  Header bidding also undercut Google's ability to trade on its customers' non-public information from one side of the transaction to its advantage on the other side of the transaction. This is directly analogous to insider trading in the financial markets context, and remained hidden by the lack of transparency into Google Ad Tech machinations. Google disingenuously announced publicly that it did not view header bidding as a threat to its business.  In reality, Google knew header bidding was an existential threat that required immediate action to neutralize.

32.     Google responded to this threat through a series of anticompetitive tactics known internally at Google as the "Jedi" program.  In March 2017, the social media company Facebook announced that it would engage in header bidding, calling it the "Facebook Audience Network" or FAN.  Rumble immediately began to use FAN, and as a result began to receive significantly more ad-revenue by using FAN than it did by using Google's Ad Tech.

33.     Google clearly understood the magnitude of the threat posed by Facebook's entry into header bidding.  In response, Google reached out to Facebook.  Google's obvious intent in doing so was to attempt to remove

Facebook as a competitor in that market, and thereby to maintain its monopoly power, to remain the only viable option available to publishers like Rumble, and to continue to collect monopoly rents.

34.     Ultimately, Google and Facebook reached an agreement, known within Google as the Jedi Blue Agreement, that removed Facebook from header bidding. Both Facebook and Google tried to keep the Jedi Blue Agreement a secret, and were successful in doing so for a long time.  That both Facebook (now Meta Platforms d/b/a Facebook) wanted to the keep that Agreement secret is an implicit admission that it was illegal.  Both companies desperately wanted to avoid public and/or governmental scrutiny of an agreement that ended significant competition between their businesses.  The massive amount of revenue Google was receiving gave it the wherewithal to "buy off" Facebook.

35.     Well before the Jedi Blue Agreement became publicly known, Rumble greatly suffered because of it.  In hindsight, it easily explains why Facebook abruptly informed Rumble that it would cease offering the header bidding services that Rumble had been using extensively—to its benefit and to Facebook's profit.  No reason was given, and the Jedi Blue Agreement was not disclosed to Rumble.  The impact on Rumble was immediate and severe; greatly reducing its ad-revenue and almost causing Rumble to go out of business.  Rumble had to lay off employees and looked to other, less efficient revenue-generating operations to survive.

36.     In addition to its anti-competitive agreement with Facebook, Google has engaged in other anticompetitive tactics designed to shut down competition from header bidding.  To Google, this was an existential threat that had to be eliminated.

37.     These tactics have been quite successful, such that Google has eliminated meaningful competition and now uses its immense and monopolistic market power to skim a monopolist's unfair portion of online advertising dollars (alleged to be from 22 percent to a whopping 42 percent of the ad dollars).

38.     Google's illegal conduct has significantly and materially harmed

Rumble and its content creators, consumers, and competition.

39.    Google's deceptive trade practices and anticompetitive conduct, including its unlawful Jedi Blue Agreement with Facebook, Google has violated and continues to violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

## V.    HOW AD SERVERS OPERATE

40.    Ad Servers are used by publishers like Rumble to manage their inventory of advertisements and how they sell ad space *indirectly* through online advertising marketplaces such as ad exchanges. Publisher Ad Servers connect with multiple marketplaces and let publishers automatically route their inventory into them for sale as the users load publishers' webpages.  As the middleman between a publisher and marketplaces (exchanges and networks), the ad server controls how the different marketplaces can access and compete for a publisher's inventory.

41.    Because the ad server sits between a publisher and the publisher's indirect sales channel, the ad server can obstruct competition between the multiple exchanges competing for publishers' impressions in a variety of ways.  For example, the ad server might interfere with a publisher's ability to share full information about its impressions with exchanges (*e.g.*, the user IDs associated with each publisher impression). Alternatively, an ad server might prevent publishers from understanding how their inventory performs in one exchange versus another. Without this transparency, a publisher like Rumble cannot decide to move its business to a better-performing exchange.  Transparency fuels competition between marketplaces to maximize value for publishers like Rumble, its content creators, and ultimately for the consumer.

42.    Despite the relative complexity of ad servers, prior to Google's entrance into the publisher ad server market, ad servers were generally regarded as a "a commodity good" that neutrally routed publishers' inventory to exchanges (thereby helping publishers like Rumble maximize their inventory yield) and

charged a low cost-per-impression rate or a relatively low monthly subscription fee.  Google's entry into this area and its anti-competitive conduct substantially changed this market to the detriment of Rumble and its content creators, consumers, and competition.

43.  Through its illegal conduct, Google has for some time monopolized and still monopolizes the publisher ad server market for display inventory through its product called Google Ad Manager (GAM).

44.  After Google  acquired its publisher ad server in 2008 from DoubleClick, in 2011 Google acquired and integrated AdMeld ("GAM"), a yield optimization technology that allowed publishers to route inventory to exchanges and networks. By acquiring GAM, Google became the middleman between publishers and exchanges, giving Google the power to foreclose competition in the exchange market, which power Google ruthlessly exercised to its great advantage and to the great disadvantage of Rumble and its content creators, consumers, and competition.

## VI.  GOOGLE'S MONOPOLIZATION OF DISPLAY AD EXCHANGES

45.  Ad exchanges for display ads are real-time auction marketplaces that match multiple buyers and multiple sellers on an impression-by-impression basis. A publisher's ad server can route the publisher's inventory to exchanges in real time as users load webpages. The exchanges then connect with advertisers through their respective middleman (*i.e.*, ad buying tools).  Ad exchanges serve as an intermediary (the middleman), connecting publishers and their inventory with willing buyers in real time.

46.  Google owns and operates the largest display ad exchange in the United States, historically called the Google Ad Exchange or "AdX."  Google has compared its ad exchange to financial exchanges like the NYSE and Nasdaq. Yet while this comparison is accurate as to the practical operation of the exchange,

unlike NYSE or NASDAQ, AdX is not an open exchange.

47.     This Figure depicts how Google AdX operates:



48.     Google's exchange charges publishers 19 to 22 percent of exchange clearing prices, which is two to four times the prices some of its nearest exchange competitors charge. These prices are indicative of monopoly power.

49.     Google's exchange fees are also exponentially higher than analogous exchange fees on a stock exchange where, by contrast, fees are low and set by volume instead of transaction value.  As discovery in this matter will undoubtedly make clear, Google can charge these exorbitant fees for one simple reason: Google uses its monopoly over publishers' ad servers to unlawfully foreclose competition in the exchange market, thereby allowing it to charge and collect a monopolist's unfair amount.

50.     By controlling publishers' inventory through its ad server and simultaneously operating the largest ad exchange, Google has inherent conflicts of interest between publishers' best interests and its own.  Google charges a lower cost for acting as publishers' sell-side intermediary but then makes substantially higher fees when selling those publishers' inventory in its exchange. Accordingly, Google incentivizes itself to steer publishers' inventory towards its own exchange, where it can extract two to four times the rate of some of its nearest exchange

competitors, even when the publisher would receive a higher price for its inventory from a competing exchange.].

51.　This Figure shows how the ad server routes to many exchanges:



## VII.  GOOGLE'S DISPLAY ADVERTISING NETWORK

52.　Google's display advertising network, known as the Google Display Network ("GDN"), has been described by Google as "the largest ad network in the world."  GDN operates as a closed marketplace accessible only by advertisers who use one of Google's products to buy publisher ad inventory.  Here, Google charges even higher fees, reported to be between 32 to 40 percent of each transaction, to the small publishers and advertisers using GDN than it does to the large players on AdX.

53.     This Figure shows how Google's ad server controls routing:



54.     Although Google executives considered creating a completely neutral platform like the NYSE, they ultimately chose instead to stack the deck in Google's favor by owning the exchange and giving preferred access to Google's buy-side middlemen.  Indeed, Google's exchange gives Google Ads and DV360 access to very valuable information and speed advantages when bidding on behalf of advertisers. Such preferred access, not quality or pricing benefits for its customers, explains why Google's ad buying tools win the overwhelming majority (reportedly over 80 percent) of the auctions hosted on Google's dominant ad exchange, AdX.

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VIII.   THE RELEVANT MARKETS AND GOOGLE'S MARKET POWER

### Publisher Ad Servers Are a Relevant Market

55.     Publisher ad servers for web display inventory in the United States are a relevant antitrust market.

56.     Publisher ad servers are inventory management systems that publishers use to manage their online display advertising inventory; that is, the image-based graphical ads shown alongside web content.

57.     Ad servers provide publishers like Rumble with features such as: (1) reservation-based sales technology to support the publisher's direct sales efforts; (2) inventory forecasting technology to help the publisher determine what inventory will be available to sell; (3) a user interface through which the publisher's sales team can input ad requirements and parameters; (4) co-management of direct and indirect sales channels; (5) report generation of ad inventory performance; (6) invoicing capabilities for the publisher's direct campaigns; (7) a decision engine for determining what ad will ultimately serve on the publisher's page; and (8) yield management technology.

58.     Generally, ad servers charge publishers based on the volume of ads served.  Most publishers will typically use just one ad server to manage all their web display inventory. When publishers sell more than one type of inventory (*e.g.*, web display, in-app, and/or video), they might use one ad server for their display inventory and a second for their in-app or video inventory, or they might still use a single ad server that manages all their ad formats. Using multiple ad servers for the same format, however, would create conflicts between the ad servers, thereby defeating the point of the ad servers' crucial inventory management functions.

59.     Publisher ad servers are unique. They are not interchangeable with exchanges, networks, advertiser ad servers, or ad buying tools for large or small advertisers. None of those products can manage a publisher's direct sales channel or

offer the reporting, invoicing, or forecasting functions publishers need to effectively manage their entire inventory and optimize yield.

60.    Advertising marketplaces, including ad networks and exchanges, are not effective substitutes for publisher ad servers.  For example, Google's exchange is not, and cannot serve as, an ad management platform for direct sales.  Google said as much when seeking to acquire DoubleClick, making explicit representations to the United States Federal Trade Commission ("FTC") regarding the non-interchangeability of ad servers and networks.  Indeed, Google described any suggestion that ad servers and ad networks are interchangeable as "seriously flawed and utterly divorced from commercial reality."  Google also represented that its existing display ad network (then called AdSense) and the ad server it sought to (and then did) acquire (called DFP) "are not direct substitutes," explaining that "[i]f the price of DFP were increased by a small but significant amount, customers would switch to other publisher-side ad serving products, such as those provided by 24/7 Real Media, Atlas/aQuantive."  In other words, Google has long acknowledged that while publisher ad servers are substitutes for each other, ad networks and other advertising marketplaces are not.

61.    The relevant geographic market for publisher display ad servers is the United States.  Publisher ad servers available in other countries are not a reasonable substitute for ad servers available in the United States.

**Google Has Monopoly Power In The Publisher Ad Server Market**

62.    Google has monopoly power in the publisher ad server market in the United States.

63.    Google's monopoly power in this market is supported and evidenced by its high market share.  More than 90 percent of larger publishers use Google's publisher ad server, Google Ad Manager ("GAM" f/k/a "DFP"), according to published reports.  It has been reported that Google internal documents show that

GAM served the vast majority (approximately 75 percent) of all online display ad impressions in the United States.

64.     By 2012, just four years after Google acquired DoubleClick, Google estimated that 78 percent of large online publishers in the United States used Google's ad server.  Rumble understands that since then, Google's closest competitors have either gone out of business or have been relegated to insignificance in the market.

65.     Defying the existence of competitive restraints, Google has degraded quality and charged supra-competitive fees in the publisher ad server market. For example, Google's ad server charges publishers for routing their inventory to exchanges and networks. When deciding how much to charge publishers for routing their inventory to non-Google exchanges, Google arbitrarily adopted 5 percent of gross spend.

66.     Google did not consider competitive constraints such as what the market would bear because it didn't have to do so given its dominance and lack of competition, which it had forced out of the market by its anticompetitive conduct.  In addition, Google's ad server typically charges a 10 percent fee of gross transactions for routing publishers' inventory to non-Google ad networks.

67.     When publishers such as Rumble routed their inventory to exchanges and networks using a non-Google routing service (header bidding), publishers paid no fee whatsoever for routing to exchanges and networks.  Google's unilateral ability to extract non-competitive ad server fees demonstrates its monopoly power.

68.     Instead of pursuing and providing procompetitive welfare-enhancing innovations with its publisher ad server, many of Google's product changes actually degraded quality, thereby further illustrating Google's monopoly power and the lack of real competitive constraints in the publisher ad server market.

69.     Google's product changes included Dynamic Allocation, Enhanced Dynamic Allocation, and Google's prohibition on publishers setting different price

floors for different ad exchanges and ad buying tools (which depresses publishers' inventory yield to Google's direct benefit).  Despite widespread publisher dissatisfaction (including from Rumble) over the price and quality of Google's ad server, Google has not suffered any appreciable loss to its ad server market share or dominance.

70.    Google's anticompetitive conduct imposes additional barriers to entry and expansion.  Perhaps most notable is Google's illegal tying of its publisher ad server with its ad exchange, ad network, and ad buying tools.  As addressed further in Section VIII below on Google's Anticompetitive Conduct, once Google had both a publisher ad server (acquired from DoubleClick) and an ad exchange (launched in 2009), Google undertook a scheme whereby a massive number of advertisers using Google Ads (the ad buying tool for smaller advertisers to bid on display space) could transact only in Google's ad network and/or ad exchange, and not in any non-Google network or exchange.

71.    With so many advertisers funneled exclusively into Google's exchange, Google's scheme also arranged that publishers could receive bids from these advertisers (necessary for maximizing yield) only by licensing Google's ad server and transacting in Google's exchange.  In other words, Google was able to and did lock both buyers and sellers into the Google Ad Tech ecosystem. The resulting situation imposes virtually insurmountable barriers to entry and expansion for any potential or actual provider of publisher ad server technology to provide meaningful competition to Google.  Moreover, this situation further illustrates how Google's pricing power is unencumbered by competitive constraints: Google demanded that it represent the buy-side, where it extracted one fee, as well as the sell-side, where it extracted a second fee, and it also forced transactions to clear in its own network and exchange, where it extracted even more fees.  In and of itself, this demonstrates Google's monopoly power in Ad Tech.  While hugely profitable for Google, these supra-competitive profits are only possible because of Google's conflicts of interest

and monopoly power, and come at the expense of competition, consumers, and publishers like Rumble and its content creators.

## Ad Exchanges Are A Relevant Market

72.     Exchanges for web display inventory in the United States are a relevant antitrust market.

73.     Exchanges for web display inventory are marketplaces in which publishers' display inventory is auctioned off to end-advertisers (through advertisers' middlemen) on an impression-by-impression basis and in real time. On the sell-side, exchanges generally interface with publishers through the publishers' ad server (*e.g.*, Google's ad server). On the buy-side, they interface with advertisers through ad buying tools, including those for large advertisers (*e.g.*, Google's DV360) and for small advertisers (*e.g.*, Google Ads), and sometimes ad networks.

74.     Exchange marketplaces exhibit several unique features. First, they do not bear inventory risk. Instead, they connect a publisher's inventory with an immediate willing buyer, as opposed to purchasing and then reselling ad space. Second, exchanges monetize by charging the publisher with a transparent percentage of transaction value, as opposed to monetizing via arbitrage or taking a non-transparent fee. Third, to sell directly on an exchange, most exchanges require publishers to meet minimum monthly requirements for impression volume and/or spend. This puts direct relationships with exchanges out of the reach of smaller publishers, who are effectively relegated to selling their inventory in the less-transparent marketplaces called networks (addressed below).

75.     Ad exchanges are unique and not interchangeable with publisher ad servers, ad networks, or ad buying tools for large or small advertisers; those products serve different types of customers (e.g., advertisers on the buy-side rather than publishers on the sell-side). They also have vastly different sets of features and price points. A small but significant increase in the price of an ad exchange does not cause

publishers to switch to an ad server, ad network, or other ad buying tool, as none of those products provide a real-time auction marketplace with the features unique to exchanges.

76.     Ad exchanges are also not interchangeable with direct sales channels. For publishers like Rumble, selling inventory directly requires substantial investment in and development of expertise around managing, selling, and serving online ad campaigns; it is an expensive proposition for publishers. For advertisers, buying inventory directly likewise requires considerable expertise and ongoing investment. For direct deals, publishers such as Rumble and advertisers alike typically must hire and maintain internal staff to manage these one-to-one relationships.

77.     Ad servers tend to charge publishers a low fixed-cost per volume of ads served, whereas exchanges tend to charge publishers anywhere from 5 percent to in excess of 20 percent of each impression's clearing price. Ultimately, a small but significant increase in price for ad exchanges does not cause customers to switch to publisher ad servers, and the barrier to switching outweighs the cost.

78.     The relevant geographic market for display ad exchanges is the United States.  Display ad exchanges available in other countries are not a reasonable substitute for display ad exchanges available in the United States.

### Google Has Monopoly Power In The Exchange Market

79.     Google has monopoly power in the United States in the display ad exchange market.

80.     Google's ad exchange (historically called AdX) has enjoyed dominance in the United States since at least 2013. By October 2019, it transacted over 60 percent of all display ad inventory sold on ad exchanges in the United States, and that percentage has increased substantially since Google's introduction of Unified Pricing rules in late 2019 (as addressed further in the Anticompetitive Conduct

section below).

81.     Finally, for online publishers with high-value users, Google's exchange transacts an even greater share of impressions. For example, Google's exchange transacts over 80 percent of one major online publisher's exchange impressions, even though the publisher routes and sells its impressions in at least six other exchanges.

82.     The closest competitors to Google's exchange include the exchanges provided by Magnite, AT&T's Xandr, and Index Exchange.  But those exchanges transact much smaller shares of publishers' exchange impressions; in comparison to the 60 percent (or more) of indirect impressions flowing through exchanges that Google's exchange routinely transacts, Google's closest exchange competitors typically transact a mere 4 to 5 percent of the same publishers' exchange impressions.

83.     Other evidence also confirms that Google has monopoly power in the display ad exchange market.  Google's exchange has the power to control prices. It is able to charge supra-competitive prices, which are believed to be 19 to 22 percent of every trade.  By contrast, the prices charged by Google's closest exchange competitors are considerably lower: believed to be from 15 percent down to a mere 5 percent. Despite their lower prices, these competing exchanges are simply unable to grow their market share.

84.     Additionally, Google's ability to increase prices (*i.e.*, its "take rate") in the exchange market further demonstrates its durable monopoly power.  With its monopoly power, Google was able to increase its exchange take rate over a two-year period from 20 percent for third-party buyers buying through AdX in 2017 to 22 percent in 2019.  The fact that Google increased its take-rate demonstrates that Google has insulated its exchange from any competitive market dynamics that would otherwise incentivize Google to lower its prices, in large part due to its anticompetitive and exclusionary conduct.

85.     Google's monopoly power is also evidenced by the fact that its exchange does not lose market share when competitors drop their prices. For example, when rival exchanges attempted to gain market share by lowering their prices in 2017, Google's exchange maintained or even increased prices and still increased its market share.  This is a clear indication of monopoly power – the antithesis of a competitive marketplace.  Competing exchanges have not been able to meaningfully increase their market shares, despite cutting their take rates by as much as 50% in some instances.

86.     Google's market power in the exchange market is also protected by significant barriers to entry and expansion that prevent any other player in the exchange market from obtaining a meaningful share of the market or posing a competitive threat to Google. A new entrant must achieve a sufficient scale of both publishers and advertisers on its exchange to become viable, and given Google's stranglehold in the Ad Tech ecosystem, that is not possible unless and until Google is forced by the Court to relinquish that hold.

87.     A second barrier is that Google unilaterally captures a large volume of the transactions otherwise available to competing exchanges by causing its publisher ad server to preferentially route transactions to its exchange (as addressed further in the Anticompetitive Conduct section below).  Moreover, Google imposes yet another barrier by exclusively and preferentially routing the bids of advertisers who use DV360 and Google Ads to Google's exchange (through a separate set of anticompetitive conduct addressed below).

88.     Rumble has long wanted to find viable alternatives to using Google's Ad Tech market and tools, including by establishing its own Advertising Center to use for its own video content advertising, and to make that available to other publishers as well.  Because of the effort and expense in doing so, however, Rumble could not.  Only recently, when Rumble raised capital, was Rumble able to establish its own advertising center (launched in alpha version in January 2022), called the

Rumble Advertising Center ("RAC") that operates in a transparent and fair way (unlike Google's Ad Tech conduct).

89.     But for Google's anticompetitive conduct as herein alleged, which deprived publishers such as Rumble of additional revenue, Rumble would have received a fair share of advertising revenue.  Based on early results, Rumble and other publishers receive roughly similar returns from comparable traffic in RAC as they did from Google Ads, even though there are significantly fewer advertisers on RAC than in Google Ads. Given the significantly greater number of advertisers in Google Ads, publishers should receive higher returns through Google's exchange. They do not because Google's anticompetitive conduct depresses publisher revenue.

## Ad Networks Are A Relevant Market

90.     Networks for web display inventory in the United States are a relevant antitrust market.

91.     The market for web display ad networks ("networks") in the United States is a relevant antitrust product market. Display ad networks are a type of indirect marketplace that differ from exchanges in their features and price points. While networks, like exchanges, match publishers' ad inventory with advertisers, networks do not necessarily do this on a real-time impression-by-impression basis. Moreover, networks often carry inventory risk. That is, they purchase (and then sell) ad impressions on their own behalf, as opposed to purchasing on behalf of an advertiser or buy-side middleman.

92.     Networks often do not provide impression-by-impression price transparency to the sell-side or buy-side of the transaction (*i.e.*, the publishers or the advertisers).  Instead, networks obscure prices within auctions, which enables them to capture undisclosed margins; neither the buyers nor sellers will know whether the network takes, *e.g.*, 20 or 50 percent of matched trades.

93.     The qualitative differences between exchanges and networks result in

two entirely different price points: networks are more expensive than exchanges on a per transaction basis.

94.     Compared to exchanges, networks tend to match smaller advertisers' ads with ad space from smaller publishers.  Smaller publishers with a comparatively lower volume of impressions are attracted to networks because, unlike exchanges, networks rarely require publishers to meet minimum impression or spend requirements.  For example, Google does not impose monthly page view or impression requirements on publishers who sell through Google's network (the Google Display Network or "GDN"). Additionally, networks tend to be more restrictive on the buy-side, often refusing to accept bids from ad buying tools for large advertisers.

95.     Ad networks are unique. They are not interchangeable with publisher ad servers, exchanges, or ad buying tools for large or small advertisers; those products serve different types of customers (*e.g.*, advertisers on the buy-side rather than publishers on the sell-side). They also have vastly different sets of features and price points. A small but significant increase in the price of an ad network does not cause publishers to switch to an ad server, an ad exchange, or other ad buying tool, as none of those products provide smaller publishers and advertisers with the features unique to network marketplaces.

96.     The relevant geographic market for display ad networks is the United States. Display ad networks available in other countries are not a reasonable substitute for display ad networks available in the United States.

**Google Has Monopoly Power In The Ad Network Market**

97.     Google has monopoly power in the web display ad network market in the United States.

98.     Google describes its ad network (GDN) as "the largest ad network marketplace in the world." GDN reaches more user impressions and websites than

any other display network, including over 2 million small online publishers globally. No other display ad network in the United States reaches as many publishers and advertisers. Google has immense scale amongst the long tail of small online publishers.

99.     Direct evidence confirms Google's monopoly power in the display ad network market.  GDN charges commissions of at least 32 percent on advertising transactions, which is approximately double the standard rate elsewhere in the industry. Internally, Google acknowledges that its fees are very high and that it can demand them because of its market power. For example, in an internal 2016 conversation, Google executives commented that Google's ad networks make "A LOT of money" with its commission, and they acknowledged that they do this because, quite simply, "we can." "Smaller pubs don't have alternative revenue sources."

100.     Significant barriers to entry and expansion protect Google's display ad network monopoly power. Employing a variety of anticompetitive tactics, Google unilaterally captures a large volume of the transactions otherwise available to competing networks by causing its publisher ad server to preferentially route transactions to its display ad network (as addressed further in the Anticompetitive Conduct section below). Moreover, Google imposes yet another barrier by preferentially routing the bids of advertisers who use Google's ad buying tool for small advertisers (Google Ads) to its own GDN ad network (through a separate set of anticompetitive conduct addressed below). Scale also operates as a barrier to entry. Ad networks need scale on both the supply and demand sides; natural network effects make it difficult for any new networks to enter and achieve the scale necessary to compete.

**Ad Buying Tools for Large and Small Advertisers**

101.   Just as publishers like Rumble use ad servers to sell advertising space

(*e.g.*, through inventory management and maximizing revenue), advertisers use ad buying tools to purchase advertising space (*e.g.*, through accessing and purchasing ad inventory appropriate for their campaigns at the lowest prices). Broadly speaking, ad buying tools let advertisers set parameters integral to their purchasing decisions, including details about the types of users they want to target and the maximum bids they are willing to submit for various types of display ad inventory. Ad buying tools then use these parameters to automatically bid (on the advertiser's behalf) for ad space in exchanges and networks.

102.   But there are two distinct types of ad buying tools—those for small advertisers and those for large advertisers—and they are not usually interchangeable. Ad buying tools for small advertisers are, in essence, pared-down versions of the ad buying tools for large advertisers, which are typically referred to as DSPs (demand-side platforms).

103.   These two different types of ad buying tools differ widely in both the features they offer and the pricing and minimum spend requirements they impose. Fundamentally, DSPs serve and are designed for a different type of advertiser than ad buying tools for small advertisers. DSPs offer robust and complex bidding and trading options ill-suited for smaller and less sophisticated advertisers. In fact, DSPs are so complex that they are frequently not used or managed by the actual advertisers, but by the advertisers' specialized ad buying team (*e.g.*, an ad agency or specialized division at an agency called a "trading desk"). Conversely, ad buying tools for small advertisers usually do not meet the transparency, optimization, sophistication, or bidding needs of large advertisers.

104.   Furthermore, the different types of ad buying tools are also sold at different price levels.  DSPs usually require high minimum monthly spend commitments, sometimes $10,000 or more, whereas ad buying tools for small advertisers can require just a few dollars to get started. For example, Amazon's DSP requires a monthly commitment of over $35,000, while Google's buying tool for

small advertisers (Google Ads) requires no monthly minimum spend. In 2020, Google Ads had thousands of advertisers that spent less than $250 per month on web display inventory in the United States; none of those advertisers would have been able to switch to Amazon's DSP or The Trade Desk because each has minimum spend requirements of over $1,000 per month. So while Amazon's DSP and The Trade Desk compete with Google's DV360, they do not compete for the small advertisers using Google Ads. Thus, a small but significant increase in price of an ad buying tool for small advertisers does not cause advertisers to switch to ad buying tools for large advertisers.

### Web Display Ad Buying Tools For Small Advertisers In The United States Is A Relevant Market

105.   The market for web display ad buying tools ("ad buying tools") for small advertisers such as Rumble in the United States is a relevant antitrust market.

106.   These tools provide an interface that smaller advertisers such as Rumble can use to bid on and purchase the display ad inventory available on ad exchanges and in ad networks. These tools allow small advertisers such as Rumble to optimize for their own interests, including purchasing the best quality display ad inventory for the lowest prices.

107.   As above, ad buying tools for small advertisers are not usually interchangeable with the ad buying tools for large advertisers. Nor are ad buying tools for small advertisers interchangeable with ad servers, ad networks, or ad exchanges; those products do not provide small advertisers with an interface to bid on and purchase ad inventory in exchanges or networks. Those products also differ significantly from ad buying tools for small advertisers insofar as they serve different types of customers, have different features sets, and come with different price and entry points. Those products are not viable alternatives in response to a small but significant price increase because they do not provide small advertisers

COMPETITION & TECHNOLOGY LAW GROUP LLP

Complaint

with the features of an ad buying tool at an affordable price point.

108.   The relevant geographic market for display ad buying tools for small advertisers is the United States. Display ad buying tools for small advertisers available in other countries are not a reasonable substitute for the display ad buying tools for small advertisers available in the United States.

## Google Has Monopoly Power In The Web Display Ad Buying Tools for Small Advertisers Market

109.   Google, with its ad buying tool Google Ads, has monopoly power in the United States in the web display ad buying tool for the small advertiser market.

110.   Google's records reveal that advertisers using Google Ads purchase at least half of the impressions in Google's ad exchange (which is the largest ad exchange), and over 60 percent of the impressions on Google's display network, GDN (which is the largest ad network).

111.   The market power of Google Ads is also evidenced by the fact that Google's exchange charges supra-competitive fees for exclusive access to Google Ads advertisers. Google's documents confirm as much, describing its exchange's ability to charge double to quadruple the prices of some of its nearest exchange competitors because of exclusive access to Google Ads advertisers. The ability to extract such rents, dependent on Google Ads exclusivity, demonstrates Google Ads' monopoly power. Moreover, running sequential auctions allows Google to extract additional non-transparent margins, which it does not disclose to advertisers.

112.   Google Ads also has market power over the small advertisers it serves because most rely on a single ad buying tool for a given advertising format (e.g., display ads). These small advertisers tend to use only one ad buying tool because using multiple ad buying tools imposes substantial additional costs in terms of the time, effort, training, and expenses that would be necessary to manage campaigns across different ad buying tools. Google Ads also does not permit small advertisers

to completely export the data they need to easily switch to another ad buying tool. As a result, while very large advertisers might be able to absorb the costs of using multiple ad buying tools at a time (though still with a difficulty that dissuades most from this path), small advertisers almost always use just one at a time.

113.   Google's market power with Google Ads is protected by at least four critical barriers to entry and expansion. First, Google Ads charges opaque fees and does not let advertisers readily audit the ad inventory Google purchases on their behalf. These act as barriers because they impede advertisers from switching to a lower-cost or higher-quality provider. Second, Google's practice of withholding YouTube video inventory from rival ad buying tools (addressed below) effectively locks single-homing small advertisers into Google's ad buying tool. In addition, other providers of ad buying tools indicate that it does not make economic sense to try to compete with Google Ads for small advertisers, because they cannot achieve sufficient scale with smaller advertisers who want to buy display, YouTube, and even search ad through just one tool. Finally, advertisers use ad buying tools to keep track of the users they have targeted with ads, the users that have made purchases, and the users that they want to keep targeting with more ads. Google Ads limits advertisers from accessing and taking this data with them to another tool. As a result, advertisers are locked in and have high switching costs; switching to a different ad buying tool provider means abandoning the valuable data and intelligence they already gathered in Google Ads and starting over from scratch.

**Instream Online Video Advertising Is A Relevant Market**

114.   Instream online video advertising is a relevant antitrust market in the United States.

115.   Online instream ads occur within the video stream of a video the user is watching (*e.g.*, a video ad before, during, or after a Rumble Video), while outstream ads occur when the user scrolls through other content (*e.g.*, a video ad that

automatically plays when scrolling through an article). Instream online video advertising is not interchangeable with other types of online advertising, like search or display advertising. Instream online video advertising typically serves distinct campaign goals for advertisers and usually commands significantly higher prices than online display ads, demonstrating that online display ads do not constrain the prices of instream online video ads. Instream online video advertising requires different technology to display video advertisements, compared to display or other forms of advertisements that are made on webpages. Instream online video advertising is also not interchangeable with outstream video advertising since the end-user behavior differs significantly—an end-user affirmatively selects and then passively watches instream video but scrolls through outstream video—leading advertisers to view the ad spaces differently.

116.   The relevant geographic market for online instream video advertising is the United States.  Online instream video advertising available in other countries is not a reasonable substitute for the online instream video advertising available in the United States because advertisers buying impressions make their purchasing decisions based on the geographic location of the end user.

**Google Has Market Power In The Instream Online Video
Advertising Market**

117.   Google, through its wholly owned vertical YouTube, has market power in the instream online video advertising market.

118.   Google/YouTube's share of the overall online video advertising market is believed to be over 50 percent in the United States, and potentially much higher for instream online video advertising.  YouTube is estimated to generate over $16 billion in ad revenue annually for Google. Google wields significant market power in the instream online video ads market, as demand for YouTube content is unique compared to other online video publishers that sell instream online video advertising

because YouTube is incredibly popular, especially with younger demographics (it is estimated that over 75% of U.S.-based internet users aged 15-25 use YouTube). In 2015, Google forced advertisers to exclusively use Google's ad buying tools to advertise on YouTube, despite previously giving access to competing ad buying tools. Google was able to make this change because its market power in the instream online video advertising market made it indispensable to advertisers seeking to reach end users through instream video, even if the advertisers preferred not to use Google's ad buying tools.

## IX. GOOGLE'S ANTICOMPETITIVE CONDUCT

119.   Google unlawfully forecloses competition in the market for publisher ad servers in the market for ad buying tools for small advertisers, and in the separate markets for ad exchanges and ad networks. Google excludes competition by engaging in conduct unlawful under settled antitrust precedent, including through unlawful tying arrangements, a pattern and practice of exclusionary conduct targeting actual and potential rivals, and even a market allocation and price fixing agreement with Facebook, at one time its largest potential competitive threat in the publisher ad server and ad network markets.

**Tying Arrangements: Google Forces Ties Between Its Ad Server, Ad Exchange, Ad-Buying Tool for Small Advertisers, And Instream Online Video Advertising Product.**

120.   Prior to Google's anticompetitive conduct, the markets for ad exchanges and publisher ad servers were competitive. When Google originally entered the ad exchange market in 2009, publishers and advertisers had been trading in exchanges for some time. Google was late to enter the ad exchange market and faced significant competition from large and well-funded players like Microsoft and Yahoo!. In 2009, the Yahoo! exchange alone, for example, processed nine billion

Complaint

daily ad impressions. After launching that same year, Google's exchange transacted fewer than 200 million daily impressions. At the time, Google also faced significant competition in the publisher ad server market. Google acquired its publisher ad server from DoubleClick in 2008 but faced competition from companies such as 24/7 Real Media (owned by WPP PLC), aQuantive (owned by Microsoft), and ValueClick (publicly traded).

121.  Google, however, quickly began pursuing an unlawful strategy to foreclose competition in both markets. At the time, Google operated an ad buying tool for small advertisers. Google originally called its product for small advertisers AdWords, but it is now known as Google Ads. Google Ads already had significant power in that market. Nearly one million small advertisers across the country— including restaurants, clothing stores, doctors, and electricians—used Google Ads to bid on display ad space.

122.  Immediately after acquiring a publisher ad server—DoubleClick (later DoubleClick for Publishers or DFP)—and launching its exchange—DoubleClick Ad Exchange or AdX—in 2009, Google began to require that the small advertisers bidding through Google Ads transact in both its ad network and exchange. Google also required that the large publishers wanting to receive bids from this enormous group of small advertisers trade in AdX and license DFP. In essence, Google demanded that it represent the buy-side, where it extracted one fee, as well as the sell-side, where it extracted a second fee, and it also forced transactions to clear in its own exchange, where it extracted a third fee.

123.  Google was able to force publishers and advertisers to trade in AdX, and publishers to license DFP, because Google Ads has had substantial market power in the US market for ad buying tool for small advertisers for at least a decade. In 2009, some 250,000 small and medium advertisers in the United States used this ad buying tool to purchase search and display ads. And since then, the number of advertisers using this tool to purchase display inventory on exchanges has rapidly

increased even further. In 2013, the number of advertisers using Google Ads doubled to two million. Today, millions of small- to medium-sized businesses use Google Ads to bid on and purchase display ad space trading in Google's AdX exchange, and those advertisers do not have alternative tools to use. Other ad buying tools attempting to compete reached far fewer advertisers, and most have now exited the market altogether, leaving advertisers without meaningful alternatives to Google's dominance.  For example, the Rumble Advertising Center has only recently launched, does not now provide any meaningful competition to Google, and will not be able to do so in the near future, if ever, unless Google's anticompetitive conduct is enjoined by this Court.

124.   Google gained its monopoly in the market for ad buying tools for small advertisers in part due to its monopoly in the display ad network market and its significant scale in search advertising. By 2009, Google's ad network GDN was the leader in reach (unique visitors to publishers' sites); Google leveraged this fact by requiring the use of Google Ads by any advertiser seeking to purchase ad space through GDN. Similarly, Google required small advertisers to use Google Ads to purchase search ads on Google Search. Google's relationships with small advertisers seeking to purchase display advertising is based on its enormous scale in search advertising. Having already established a relationship with small advertisers by selling search advertising, the marginal cost for selling display advertising to those same small advertisers is negligible. Google's competitors, by contrast, find it uneconomical to reach a sufficient number of small advertisers at scale to offer buying tools to compete with Google Ads.

125.   Google Ads also had market power over its small advertisers because those advertisers almost always use just one ad buying tool at a time. When deciding which ad buying tool to use, most advertisers chose Google's because it was the only way to purchase Google Search ads and display ads on Google's leading display network, GDN.

126.   Google monopolized the exchange and ad server markets by forcing publishers to license Google's ad server and trade through Google's exchange in order to receive bids from the more than one million advertisers using Google's buying tool, Google Ads. First, Google automatically routed small advertisers' ad network bids to Google's exchange. Additionally, Google refused to route advertisers' bids to non-Google exchanges. Next, Google programmed its exchange to return real-time bids only to those publishers using Google's new publisher ad server. As Google wrote in an internal PowerPoint presentation in 2014, "AdX is also the only platform with direct access to the entirety of AdWords demand, one of the world's largest ad networks."

127.   Through this conduct, Google acted against the best interests of the small advertisers bidding through Google Ads. If Google were serving the interests of the small businesses using Google Ads, Google would have routed their bids to the exchanges that offered the lowest prices for the identical inventory, just as competing ad buying tools did. In a competitive market, advertisers prefer to buy across multiple exchanges in order to reach the largest possible pool of supply at the best possible prices, thereby enabling and fostering competition between the exchanges.

128.   Internal Google documents reveal that Google imposed these bid routing restrictions for the express purpose of foreclosing competition. In a Display Strategy document from August 2012, Google noted that it "[is] artificially handicapping [its] buyside [Google Ads] to boost the attractiveness of [its] sell-side (AdX). Specifically, to limit [Google Ads] to buying only on AdX, an exclusivity that makes AdX more attractive to sellers."

129.   Because publishers are usually interested in exchanges returning real-time bids for their inventory, Google effectively required publishers to use its ad server in order to work with its exchange. Publishers also only use a single ad server at a time to manage their inventory, so they had to forgo either (a) using any

competing ad server or (b) access to the enormous pool of advertisers using Google Ads and bidding into Google's exchange. From the first days of Google's AdX exchange, advertisers bidding through Google Ads made up the vast majority of purchases in Google's exchange: around half of total transactions by revenue within a year of AdX's launch, 59 percent of total transactions a few years later, and about two-thirds of all transactions today.

130.   An article in The Wall Street Journal explained Google's conduct as follows: "Using Google's [ad server] DoubleClick for Publishers is the only way to get full access to Google's AdX exchange, publishers say. For many years, Google's AdX was the only ad exchange that had access to this fire hose of ad dollars."

131.   Google's conduct successfully foreclosed competition in the publisher ad server and exchange markets. When Google acquired the DoubleClick ad server in 2008, Google's share of the publisher ad server market was around 48 to 57 percent, and Google faced competition in both the ad server and ad exchange markets. In the ad server market, Google has now effectively foreclosed publisher ad server competition from companies that included 24/7 Real Media, aQuantive, and ValueClick. As internal Google documents show, by coupling its ad server with its substantial market power on the buy-side, Google prevented publishers from switching to competing ad servers and quickly cornered the remainder of the market. By 2011, approximately 78 percent of publishers in the United States used Google's ad server, and by 2019, Google's share of the market increased to over 90 percent of large publishers.

132.   Google maintained its monopoly power over ad servers and its stranglehold in the ad exchange market by continuing the same type of exclusionary conduct. In 2016, Google started routing the bids of small advertisers from Google's buying tool to non-Google exchanges, but significantly and intentionally restrained the routing of bids to non-Google exchanges for the express purpose of continuing to exclude and suppress competition. Google's exchange also continues to return live

bids only to publishers using Google's ad server. In sum, Google did not want to actually undo its Google Ads—Exchange—Ad Server tie.

133.   Google similarly requires publishers seeking access to large advertisers' bids to trade in Google's exchange (and pay Google's exchange fees) and to license Google's ad server (and pay Google's ad server license fees). Google's strategies here are numerous and discussed throughout this Complaint. For instance, Google uses mandatory price floors (discussed below in paragraphs 232 to 241) and other auction manipulations like Project Bernanke (discussed below in paragraphs 151-164) to force publishers to transact with DV360 advertisers in Google's exchange. Uniform Price floors are not competition on the merits. Google deployed another project called project Poirot to detect and reduce spending on non-Google exchanges. Finally, Google makes many of the features in DV360 (*e.g.*, affinity audiences targeting) unavailable to advertisers if they participate in exchanges other than Google's, which results in many advertisers using Google's exchange even though they would not do so in a competitive market. Because Google's exchange then only routes live bids to publishers like Rumble using Google's publisher ad server, publishers are effectively forced to use Google's publisher ad server to receive bids from DV360 advertisers. This conduct enables Google to maintain its monopoly power in the publisher ad server market and exclude competition in the exchange market. Google has specifically discussed this "lock in" effect internally.

**Dynamic Allocation: Google Uses Dynamic Allocation To Impede Competition From Non-Google Exchanges**

134.   Prior to 2009, Google's ad server permitted publishers to rank which exchanges would be allowed to submit bids on an available impression. This process allowed exchanges to compete with one another to be ranked highly by publishers and more likely to win publishers' valuable impressions. Starting in 2010, Google used its ad server to foreclose exchange competition by preferentially routing

COMPETITION &
TECHNOLOGY LAW
GROUP LLP

1  publishers' inventory to Google's new exchange through a process it called

2  Dynamic Allocation.

3      135.   At a high level, Dynamic Allocation granted Google's exchange a novel

4  (and unearned) advantage; Google's exchange was given a right of first refusal on all

5  of the impressions a publisher made available to exchanges. Under Dynamic

6  Allocation, Google's ad server let Google's exchange compete for publishers'

7  impressions by returning live bids, while requiring non-Google exchanges to

8  compete for the same impressions with static non-live bids. Usually, an exchange's

9  static bid was set to equal the overall price the exchange historically paid for

10  publishers' impressions.  Google's ad server passed the rival's static bid to Google's

11  exchange and permitted Google's exchange to purchase the impression by paying

12  just one penny more than the static bid. In other words, Google used its ad server's

13  control over publishers' inventory to let its exchange view a  valuable impression

14  from a publisher and purchase that impression for just a penny more than the

15  average price that non-Google exchanges paid for an average impression from that

16  publisher—just like allowing a buyer to purchase a front row seat at a hockey game

17  for one penny more than the average price for any seat in the stadium.

18      136.   Google's adoption of Dynamic Allocation in 2010 ended DoubleClick's

19  neutrality as a seller's agent. Prior to Google's acquisition of DoubleClick,

20  DoubleClick operated a publisher ad server but did not have an operational

21  exchange. The DoubleClick publisher ad server routed publishers' impressions to

22  exchanges and networks in a neutral manner to maximize publishers' yield which

23  allowed for competition amongst exchanges to win impressions. Under Google's

24  control, Dynamic Allocation ended the neutrality of the DoubleClick ad server and

25  highlighted the problems with Google's conflicts of interest.

26      137.   Google's ad server passed inside information to Google's exchange and

27  permitted Google's exchange to purchase valuable impressions at artificially

28  depressed prices. Competing exchanges were deprived of the opportunity to compete

for inventory and left with the low-value impressions passed over by Google's exchange.

138.   Google, mirroring the duties of financial brokers to their clients, promised publishers that its publisher ad server would act in their best interests. Google told publishers, for instance, that Dynamic Allocation maximized their inventory yield; it "maximizes revenue," Google advertised about its publisher ad server. Google also told publishers that, with Dynamic Allocation, publishers have a "risk-free way to get the highest real-time revenues for all their non-guaranteed impressions."

139.   In fact, Google concealed the nature of its conduct and knew that Dynamic Allocation did not in fact maximize publishers' yield but was actually designed to foreclose competition amongst exchanges. Google internally discussed how publishers could make more money selling their inventory if exchanges really competed. Internal Google documents reveal Google's knowledge of its own misrepresentations, stating that "the optimal publisher set up includes multiple exchanges in order to capture the largest demand pool and increase RPMs [revenue per impression] through [exchange] competition." In fact, according to one Google study, competition between exchanges increased publishers' clearing prices by an average of 40 percent. In other words, Dynamic Allocation had permitted Google's exchange to clear publishers' inventory for depressed prices, denying rival exchanges the ability to compete on the merits for that inventory. One industry publication put it succinctly, "[t]he lack of competition was costing pub[s] cold hard cash." Dynamic Allocation was exclusionary conduct that foreclosed competition in the exchange market by permitting Google's exchange to transact a large number of publishers' impressions (with an emphasis on publishers' high-value impressions) at depressed prices. Competing exchanges were left with the ad impressions passed over by AdX and starved of liquidity. Despite entering a competitive exchange market, Google used its ad server and Dynamic Allocation to push its AdX exchange

to the top of the market by 2013.

### User ID Encryption: Google Restricts Information To Foreclose Competition And Advantage Itself

140.    Google further foreclosed competition in the exchange and ad buying tool markets by blocking publishers' ability to deliver information about their heterogenous inventory to competing tools.

141.    Google's ad server, DFP, manages publishers' inventory and promises to maximize its yield. To do so, the ad server attempts to identify a site's visitor, assigning an individual ID to each visitor.

142.    This information is critical for advertisers deciding whether to bid on inventory. To sell an ad impression at a price reflective of its true value to an advertiser, publishers (and the exchanges selling on their behalf) must adequately identify the user profile associated with the impression. Indeed, that capability is one of the key factors that makes digital display advertising different from and more valuable than offline advertising. User IDs permit publishers and their exchanges to understand the value of inventory, cap the number of times users see the same ad, and effectively target and track online advertising campaigns. When exchanges cannot identify user profiles in auctions (e.g., through cookies), the prices of impressions on exchanges can fall by about 50 percent, according to one Google study.

143.    In 2009, shortly after Google's acquisition of DoubleClick, Google's DFP ad server started hashing or encrypting publishers' user IDs, prohibiting publishers from sharing those IDs with non- Google exchanges and non-Google ad buying tools. Google thus strategically prevented publishers' users from being easily identified, with one critical caveat: Google enables itself to use that very same information for its own trade decisions.

144.    At the time of the DoubleClick acquisition, Google made

representations to both the FTC and the United States Congress regarding publishers' control and ownership over their critical ad server data. Google assured Congress that DoubleClick "data is owned by the customers, publishers and advertisers, and DoubleClick or Google cannot do anything with it." And Google represented to the FTC that "customer and competitor information that DoubleClick collects currently belongs to publishers, not DoubleClick," and "[r]estrictions in DoubleClick's contracts with its customers, which those customers insisted on, protect that information from disclosure." Google then "committed to the sanctity of those contracts." In essence, DoubleClick's contracts rendered publishers' data confidential and non-public, thereby prohibiting Google from using that data to act against publishers' interests.

145.   Despite these representations Google made to the FTC and Congress, shortly after the deal closed, Google started restricting publishers' ability to access and share their DFP user IDs. Google accomplished this by hashing or encrypting the user IDs differently for each publisher using Google's ad server (e.g., John Connor = user QWERT12345), as well as for each advertiser bidding through Google's ad buying tools (e.g., John Connor = user YUIOP67890). This change interfered with publishers' ability to share consistent user IDs with non-Google exchanges and networks. As a result, publishers, along with their advertisers, exchanges, and networks, could not easily know that two different user IDs belonged to the same user.

146.   While Google blocked publishers from accessing and sharing these user IDs with non- Google exchanges and networks, Google shared the same raw IDs its own ad network (GDN) and exchange (AdX), as well as with Google's own ad buying tools (DV360 and Google Ads). So for Google's network, exchange, and ad buying tools, John Connor is always HJKLM54321. In other words, the only way for publishers and advertisers to easily know that two different user IDs actually related to the same individual was to use Google's ad buying tools and trade in Google's

exchange.

147.   The restrictions Google imposed on publishers' access to ad server user IDs meant that publishers and advertisers trading on non-Google exchanges did so at their own risk. By blocking publishers' ability to access and share their ad server user IDs, Google's exchange would always have better information about publishers' heterogenous inventory. As a result, advertisers bidding through a non-Google ad buying tool or exchange could not efficiently know if they are bidding on valuable impressions, cap the frequency that consumers see their same ads, target audiences, or avoid bidding against themselves in second-price exchange auctions. But, of course publishers and advertisers could simply transact in Google's exchange using Google's ad buying tools and thereby avoid all of these harms Google artificially created. In essence, by scrambling the DoubleClick ad server user IDs, Google created a "heads I win, tails you lose" scenario.

148.   Ultimately, Google is undermining the quality of its ad server—and thus sacrificing profits—by imposing these restrictions. As Google admits, the purpose of an ad server is to help a publisher maximize revenue for its inventory. The best way to do that is to deliver high-quality information about the publishers' inventory to as many different bidding partners as possible. By limiting the bidding partners to whom DFP publishers can share user ID information to Google's own exchanges and ad buying tools, Google reduces the amount advertisers using those non-Google tools would be willing to bid. That is not revenue-maximizing for DFP's publisher customers, which likely is why DoubleClick never imposed such discriminatory limitations prior to Google's acquisition of it. But Google is willing to sacrifice the quality (and profitability) of DFP to the anticompetitive goal of disadvantaging rival ad exchanges and ad buying tools.

149.   Google has cited vague and amorphous "privacy concerns" to defend its restrictions on publishers sharing user IDs with non-Google exchanges and ad buying tools. Clearly, Google's conduct was not being motivated by concerns for

1    user privacy rights.

2        150.   For example, Google's sweetheart Jedi Blue deal with Facebook in and

3    of itself shows that its privacy concerns were pretextual. The Jedi Blue agreement

4    was an attempt by Google to halt the development of header bidding, which Google

5    saw as a threat to AdX's market power. This agreement provided Facebook with

6    several advantages in Google's ad auctions, with the purpose (and effect) of

7    dissuading Facebook from participating in header bidding. One of those advantages

8    was that Google promised to use "commercially reasonable efforts" to help

9    Facebook recognize the identity of users in DFP publishers' auctions. Google was

10   thus willing to overlook its claimed privacy concerns to convince Facebook to

11   abandon header bidding.

12
13                **Project Bernanke: Google Forecloses Competition By**
                 **Using Inside Information To Win Auctions**
14

15       151.   Google is able to further exploit its monopoly in ad servers to the

16   detriment of publishers and competition in the ad-buying tools, ad server, and ad

17   exchange markets. Google's next step was to begin using its exclusive access to

18   publishers' raw ad server user IDs to develop a number of internal non-transparent

19   auction programs that excluded competition in the exchange market. Google has

20   used its inside information advantage to engage in various forms of price

21   discrimination and opportunity allocation, engineering auction outcomes that are

22   different than those that would result from a free and open bid process, raising prices

23   on advertiser customers and pushing exchange competitors out of the market. These

24   programs ensured that publishers' impressions, especially the high value ones,

25   would transact through Google's exchange and ad buying tools and deny

26   competitors' the ability to compete on the merits with Google's offerings. Google

27   publicly says its products and product features are good for publishers and

28   advertisers, but they are not. Behind the scenes, Google manipulates the bidding

COMPETITION &
TECHNOLOGY LAW
GROUP LLP

Complaint

1   process to maximize its own profits and reduce competition for ad exchanges.

2       152.   Google's New York-based quantitative team "gTrade" designed one

3   such program called Reserve Price Optimization ("RPO"). Google automatically

4   opted publishers into RPO in 2015 without informing publishers. Google's RPO

5   program used exclusive access to publishers' user IDs derived from the Google

6   publisher ad server combined with bid history data from AdX to dynamically adjust

7   the price floors publishers had set in Google's exchange on a per-buyer basis

8   depending on what Google knows a particular buyer will actually pay based on their

9   historical bids. For example, if a publisher had set its floor price to a $10 CPM, RPO

10  can increase the floor price to just below a buyer's predicted willingness to pay, e.g.,

11  a $14.50 CPM floor if a buyer is expected to bid $15. This would force advertisers in

12  Google's second-price exchange auctions to pay the RPO floor set by Google as

13  opposed to the amount actually bid by the auction's second-highest bidder. In other

14  words, Google would manipulate the price paid by a small business advertiser that

15  won a bid from one price to another higher price (e.g., from $11 CPM, the second

16  bid, to $14.50, the artificial price floor), without disclosing the manipulation to the

17  advertiser or the publisher. By adjusting floors in this manner, Google abused the

18  information it collected from its ad server and ensured that its own exchange would

19  return artificially high revenues for publishers' most valuable impressions, even

20  though an advertiser in a non-Google exchange would have otherwise won the

21  impression with a lower bid. Competing exchanges could not similarly adjust their

22  floors because Google blocks publishers from sharing their ad server user IDs with

23  non-Google exchanges. By inflating the prices that Google's exchange would return

24  for publishers, Google harmed other exchanges' ability to compete for publishers'

25  valuable impressions. If rival ad exchanges had access to the same information

26  Google's ad server shared with Google's exchange, they might have been able to

27  develop dynamic floor-based pricing to compete with Google's offering. Instead,

28  Google manipulated advertiser buyers into paying inflated prices in order to make its

exchange produce higher revenues for publishers compared to other exchanges.

153. Google's gTrade team launched another program in 2014, called Dynamic Revenue Share (DRS), that leveraged exclusive access to publishers' ad server user IDs to harm exchange competition in a second way. DRS dynamically adjusted Google's fee after soliciting bids in the auction to give Google's AdX wins for impressions it should have lost to other exchanges. In an honest transaction, Google would lose a bid if it could not clear a publisher's pre-set floor after accounting for Google's exchange fee. Under DRS, Google's AdX could view rivals' bids after the fact and adjust its fee to offer a bid that would win the impression even if Google's take rate should have caused Google to lose the bid.

154. Google's conduct harmed competition among ad exchanges because rival exchanges lost out on valuable bids that they should have won, denying them revenue and share, while Google earned additional revenue that it had not earned honestly. Google's manipulation of floors and bids after viewing rivals' bids is something it could only do because of its monopoly ad server and prevented other exchanges from competing on take rates. DRS made it so that Google could avoid price competition with its exchange rivals without sacrificing Google's exchange market share because competing exchanges could not beat Google's insider information. Google's actions also stopped advertisers and publishers from making informed decisions about which exchanges could be trusted to return the highest value for their impressions and bids, respectively. Google automatically opted publishers into the DRS program under the misrepresentation that it would make publishers more money. Google did not reveal the inner workings of DRS or how it was impacting the bids being made by Google, denying publishers increased revenue and upending their desired preferences for exchanges based on the floor prices the publishers set.

155. In 2013, Google's gTrade team designed Project Bernanke, yet another behind-the-scenes, not-publicly-disclosed program designed to exclude competition.

Named after the former Federal Reserve Chairman who used "quantitative easing" during the 2008 financial crisis to create enormous amounts of new money, Project Bernanke used Google's privileged access to detailed information regarding what advertisers historically bid to help advertisers using Google Ads beat the advertisers bidding through competitors' ad buying tools.

156.    Project Bernanke secretly switched some impressions on AdX to a third-price auction while publishers and advertisers were led to believe AdX was still using a second-price model. Under Bernanke, AdX would drop the second-highest bid from the auction if two bids from Google Ads advertisers were above the floor. If an impression were up for auction and three bids were served (for example, a $19 bid from a Google Ads advertiser, a $18 bid from a Google Ads advertiser, and a $9 bid from a non-Google Ads advertiser) a second-price auction would set the price at the second bid, which the publisher would receive minus Google's exchange fee. Under Bernanke, AdX would ignore the second-place bid and the publisher would only receive the price of the third-place bid. However, Google would not charge the winning bidder the price of third-place bid; instead, Google would still charge the winner the second-place bid and retain the difference between that bid and the actual payout made to the publisher (minus Google's fee). Google would then use that retained funds to inflate the bids of advertisers bidding through Google Ads to help them win impressions that they should have lost to advertisers bidding through non-Google tools.

157.    Google began Project Bernanke because it felt that Google Ads were losing too many bids on AdX to rival buyers. Google also intended for Bernanke to boost the number of impressions transacted through AdX, which would harm competing exchanges by denying them share and impressions they should have won. The Bernanke-inflated bids would increase AdX's ability to win high-value impressions and leave lower value impressions for other exchanges.

158.    Over time, Google developed three iterations of Project Bernanke, each

of which harmed competition in the exchange market. The initial version, described above, took money from winning bids and accumulated a pool used to manipulate and inflate bids rather than pay the funds that should have been given to the publisher. A second version, "Global Bernanke," was begun in May 2015 and dropped the second highest bid across publisher's auctions, accumulated the money into a single global pool and spent that pool money to boost bids belonging to Google Ads advertisers who otherwise might have lost if they were too close to a price floor set by a publisher for AdX. Global Bernanke was applied to floors publishers set in DFP and to floors Google set for itself after peeking at rivals' bids (such as through Dynamic Allocation).

159.   Google then designed a third version of Bernanke, called "Bell." Bell changed how Bernanke allocated funds from the pool of money accumulated from publishers. Bell used Google Global Publisher Tags to pre-determine if a publisher would provide AdX preferential access to its inventory. If publishers did not give AdX preferential access, Bell would switch their auctions to third-place auctions, decreasing their revenue from AdX. Bell would redirect Bernanke funds to inflate bids of publishers that did give AdX preferential access. Project Bell caused harm in the ad server market because if a publisher did not grant AdX preferential treatment it would manipulate bids on their impressions to benefit publishers that did grant preferential access. Google used its power in the ad server market to punish publishers that did not give AdX preferential access.

160.   Google did not inform publishers or advertisers that it implemented any of the Project Bernanke iterations. Bernanke was obviously harmful to publishers, as they would receive a lower price than they should have from the honest second-price auction that Google claimed it was using. Bernanke also impacted publishers' ability to choose which exchanges it preferred; publishers might set higher floors for Google Ads than other demand sources, but Bernanke would allow Google buyers to win bids they should not have at the expense of non-Google buyers.

161.   Bernanke also harmed advertisers, who paid a higher price (the second-place bid) to Google than the bid Google was reporting to publishers (the third-place bid). Bernanke would also have the effect of rerouting their ads to less relevant impressions merely to ensure that AdX could beat out other exchanges for impressions that Google wanted to win.

162.   The iterations of Bernanke were exclusionary and foreclosed competition in the ad buying tools and exchange markets. Bernanke was designed to make it so that non-Google tools could not outbid Google Ads on AdX. Google could do this because it could access bid information from its publisher ad server and inflate advertisers' bids by drawing from the Bernanke funds. These actions gave Google Ads an unfair advantage and injured other ad buying tools' ability to compete for customers. Bernanke also made it possible for AdX to win high value impressions that should have gone to rival exchanges. Google's conduct vastly reduced the share of other exchanges without bringing any increased value to publishers and advertisers. Instead, Bernanke harmed rivals, publishers, and advertisers solely for Google's benefit. Google's internal estimates valued the effect of Project Bernanke at over $200 million in its first year and estimated over $100 million in revenue per year just from Project Bell.

163.   The preceding gTrade programs represent an illustrative but incomplete sample of the sophisticated auction programs Google uses to exclude competition in the exchange and ad buying tool markets. Google's gTrade team developed other programs, including "Bell" and "Elmo," that also use inside information to privilege Google's exchange over rival exchanges. These programs depend on Google cutting off access to publishers' ad server user IDs and rendering access to those IDs exclusively for Google. The programs create inefficiencies in the allocation of impressions and reduce competitors' ability to compete on price.

164.   Moreover, these programs account for substantial additional Google revenue at the direct expense of harm to competition.  RPO alone accounts for an

additional $250 million dollars of annual recurring revenue, while various other auction programs shift substantial additional revenue to Google: DRS ($250m), Bernanke ($230m), Bell ($140m), and Elmo ($220m). In short, Google uses its monopoly power to manipulate auctions through algorithms that modify the exchange architecture in order to extract hundreds of millions of dollars in additional revenue and harm consumers by foreclosing competition.

### Enhanced Dynamic Allocation: Google Blocks Competing Exchanges From Gaining Access To Publishers' High-Value Inventory And Thus Reaps The Revenue Benefits For Itself

165.   Google foreclosed exchange competition for publishers' valuable impressions through a program called Enhanced Dynamic Allocation ("EDA"). Historically, publishers sold their best impressions to advertisers directly for premium prices. With EDA, Google's ad server allowed Google's exchange to compete for and purchase valuable impressions that the ad server would previously allocate to publishers' premium direct deals. Google blocked non-Google exchanges from competing for those same impressions.

166.   Before EDA, when a publisher sold their inventory to an advertiser through a direct deal for premium prices, Google's ad server made it a priority to allocate impressions to that direct deal. But with EDA, Google would evaluate each impression's value and then, based on that value, decide whether to allocate the impression towards meeting a direct deal's reservation goal or to instead re-direct it to an exchange auction.

167.   In a review of revenue and impressions on AdX in the United States, Google found that the vast majority (around 80 percent) of web publishers' ad revenue is generated from a much smaller percent (around 20 percent) of impressions. Google refers to this internally as "cookie concentration."

168.   As a result of this "cookie concentration" dynamic, EDA made it so

only Google's exchange could trade publishers' most valuable inventory. However, competition in the exchange market depends on being able to trade both volume and valuable impressions. By blocking non- Google exchanges from competing against Google's exchange, Google foreclosed competition in the exchange market and shielded Google's exchange from competition.

169.   At the same time, EDA permitted Google's exchange to purchase publishers' impressions for depressed prices. Specifically, Google's ad server permitted its exchange to purchase impressions for one penny more than the reserve price floor it instituted and called the "temporary competing price." If Google had set this price to a $7 CPM, but a competing exchange would have returned a $14 CPM bid, Google let its own exchange nonetheless win for $7.01. In other words, EDA let Google's exchange acquire publishers' impressions at depressed and non-competitive prices.

### EDA Also Excluded Competition From Publishers' Direct Sales Channel (Direct Deals)

170.   Google foreclosed exchange competition for publishers' valuable impressions through a program called Enhanced Dynamic Allocation ("EDA") that began in 2014. Historically, publishers sold their best impressions to advertisers directly for premium prices. With EDA, Google's ad server let Google's exchange compete for and purchase valuable impressions that the ad server would previously allocate to publishers' premium direct deals. Google blocked non-Google exchanges from competing for those same impressions.

171.   Before EDA, when a publisher sold their inventory to an advertiser through a direct deal for premium prices, Google's ad server made it a priority to allocate impressions to that direct deal. But with EDA, Google would evaluate each impression's value and then, based on that value, decide whether to allocate the impression towards meeting a direct deal's reservation goal or to instead re-direct it

1   to an exchange auction on AdX.

2   172.   EDA created a pool of publishers' inventory that Google's server would

3   only give to AdX, and the pool was designed to have the most high-value

4   impressions (such as those displayed in the most prominent part of a webpage). In a

5   review of revenue and impressions on AdX in the United States, Google found that

6   the vast majority (around 80 percent) of web publishers' ad revenue is generated

7   from a much smaller percent (around 20 percent) of impressions. Google refers to

8   this internally as "cookie concentration."

9   173.   As a result of this "cookie concentration" dynamic, EDA it was

10  designed so only Google's exchange could trade publishers' most valuable

11  inventory. Competition in the exchange market depends on being able to trade both

12  volume and valuable impressions. By using its ad server to block non-Google

13  exchanges from competing against Google's exchange for these high-value

14  impressions, Google foreclosed competition in the exchange market and shielded

15  Google's exchange from competition, all while reducing publishers' yield.

16  174.   EDA permitted Google's exchange to purchase publishers' impressions

17  for depressed prices. Specifically, Google's ad server permitted its exchange to

18  purchase impressions for one penny more than the reserve price floor Google

19  instituted and called the "temporary competing price." If Google had set this price to

20  a $7 CPM, but a competing exchange would have returned a $14 CPM bid, Google

21  let its own exchange nonetheless win for $7.01. In other words, EDA let Google's

22  exchange acquire publishers' impressions at depressed and non-competitive prices

23  because it stopped AdX from being forced to compete with other exchanges for

24  these valuable impressions.

25  175.   Like Google's strategy with Dynamic Allocation, Google enrolled

26  publishers in EDA automatically and urged them to stay enrolled under a false

27  pretense. Google falsely told publishers that EDA "maximizes yield." EDA did not,

28  however, maximize publishers' yield. Internally, Google understood that the EDA

1  program was a scheme to let Google's exchange simply "cherry-pick [publishers']
2  higher-revenue impressions." In fact, cherry-picking the best impressions under
3  EDA helped Google make an additional $150 million per year. Publishers today
4  must leave EDA enabled or AdX will not return live, competitive bids for their
5  impressions.

6      176.   To make matters worse, Google's practice of scrambling user IDs
7  (discussed above in paragraphs 140-150] concealed the true nature of Google's
8  conduct. Publishers could not easily know that, with EDA, Google was cherry-
9  picking impressions. By scrambling the IDs differently for publishers and
10  advertisers, publishers could not easily work with advertisers to confirm that
11  advertisers were receiving the valuable impressions (e.g., ads shown to users with
12  high net worth) as opposed to the low value ones (e.g., ads shown to a user in a
13  developing country with minimal purchasing power).

14      177.   In summary, Google's actions at issue here—including Dynamic
15  Allocation, the encryption of IDs for users that consent to ID sharing, and EDA—
16  were all unlawful schemes to exclude competition. Without being able to compete
17  for publishers' impressions or receive full information about their inventory, non-
18  Google exchanges could not compete on quality (volume) or price (take rate). As a
19  result, even large and powerful companies like Microsoft and Yahoo! exited the
20  market. By blocking competition outright, Google is able to charge very high 19-22
21  percent commissions on transactions, which is two to four times higher than the
22  commissions charged by competing exchanges.

23      178.   Google's ad server let its exchange cherry pick the valuable
24  impressions and then funnel lower- value impressions to publishers' direct deals.
25  Advertisers who paid high prices for premium inventory through direct deals
26  unknowingly received publishers' lower quality inventory in return. Over time, as a
27  consequence of this behavior, the value of direct-sold inventory declined and
28  advertisers re-allocated spending towards Google's exchange (where they must pay

Google's high exchange fees).

179. Like Google's strategy with Dynamic Allocation, Google invited publishers to enable EDA under a false pretense. Wearing their publisher ad server hat, Google falsely told publishers that EDA "maximizes yield." EDA did not, however, maximize publishers' yield. Internally, Google understood that the EDA program was a scheme to let Google's exchange simply "cherry-pick [publishers'] higher-revenue impressions." In fact, cherry-picking the best impressions under EDA helped Google make an additional $150 million per year.

180. To make matters worse, Google's practice of scrambling user IDs (discussed above in paragraphs 142-147) concealed the true nature of Google's conduct. Publishers could not easily know that, with EDA, Google was cherry-picking impressions. By scrambling the IDs differently for publishers and advertisers, publishers could not easily work with advertisers to confirm that advertisers were receiving the valuable impressions (e.g., ads shown to users with high net worth) as opposed to the low value ones (e.g., ads shown to a user in a developing country with minimal purchasing power).

181. In summary, Google's actions at issue here—including waterfalling and Dynamic Allocation, the encryption of IDs for users that consent to ID sharing, and EDA—were all unlawful schemes to exclude competition. Without being able to compete for publishers' impressions or receive full information about their inventory, non-Google exchanges could not compete on quality (volume) or price (take rate). As a result, even large and powerful companies like Microsoft and Yahoo! exited the market. By blocking competition outright, Google is able to charge very high 19-22 percent commissions on transactions, which is two to four times higher than the commissions charged by competing exchanges. These extra costs invariably are passed onto American consumers, who are harmed through higher prices and lower-quality goods and services.

///

COMPETITION &
TECHNOLOGY LAW
GROUP LLP

Complaint

**"Header Bidding" Promotes Competition Until Google Neutralizes It By Conspiring And Cutting a Sweetheart Deal With Facebook**

182.   In 2014, publishers rapidly adopted an innovation called "header bidding" (also known as "HB") that permitted them to route inventory to multiple exchanges. Publishers, advertisers, and exchanges quickly adopted the method to facilitate exchange competition. Google, however, did not welcome the competition. Instead, Google wanted to "kill" header bidding. First, Google introduced an alternative that secretly routed publishers' inventory back to Google's exchange, even when another exchange returned a higher bid. In time, Google's goal became to destroy header bidding entirely.

183.   Header bidding involves a creative piece of code that publishers could insert into the header section of their webpages to facilitate competition between exchanges. When a user visited a page, the code enabled publishers to direct a user's browser to solicit real-time bids from multiple exchanges, before Google's ad server could prevent them from doing so. Instead of being subject to the restraints of Google's ad server, header bidding shifted routing from the ad server to the browser. Publishers then sent the highest exchange bid in header bidding into their Google ad server. In short, header bidding created a technical workaround for publishers to circumvent Google's efforts to foreclose competition in the exchange market.

184.   So, header bidding became quite popular. Some of the biggest tech companies (including, *e.g.*, Amazon) participated in header bidding, and by 2015, publishers and advertisers alike were rapidly adopting the innovation. By 2016, approximately 70 percent of major publishers in the United States were using header bidding to route their inventory to multiple exchanges, sometimes as many as twenty.

185.   Publishers in particular adopted the protocol because they came to realize what Google already knew. Waterfalling, Dynamic Allocation, and EDA did not actually maximize publishers' yield. Instead, as Google discussed behind closed

doors, "pitting multiple exchanges against one another fostered price competition, which was good for [publishers'] business." In fact, it was incredibly good for publishers. With header bidding, publishers saw their ad revenue jump overnight simply because exchanges could actually compete. One Google employee conceded internally how ending exclusivity with Google's exchange caused the ad revenues of Weather.com to jump by 30 percent. Some publishers' revenue jumped by 40 to over 100 percent.

186.    Header bidding was also a positive development for advertisers and consumers. For advertisers, header bidding allowed them to transact through an exchange of their choosing, including exchanges imposing less than Google's monopolistic 19 to 22 percent fees. Internally, Google conceded its fees were supra-competitive and not "likely justified by value."

187.    Moreover, consumers benefited by virtue of the increased revenue realized by publishers as well as the fees saved by advertisers. With more ad revenue, publishers produce more content and better subsidized content access. Lower exchange take rates also reduced deadweight costs that advertisers ultimately pass on to consumers. Consumers benefit through higher-quality and lower-priced goods and services.

188.    Based on a review of Google's internal documents, Google wanted to quash this header bidding innovation for three basic reasons: avoiding price competition, permitting itself to continue to trade on inside information, and foreclosing competition against its publisher ad server monopoly.

189.    First, Google wanted to eliminate header bidding in order to protect its high exchange take rates from competition. As Google discussed internally, "20% for just sell-side platform/exchange isn't likely justified by value." Google employee emailed internally in November 2017 that she thought exchange "margins will stabilize at around 5 percent. Maybe it will happen by this time next year or in early 2019. This creates an obvious dilemma for us. AdX is the lifeblood of our

programmatic business. … What do we do?" Such a dramatic reduction to Google's exchange take rates toward competitive rates was an obvious threat posed by header bidding competition.

190.   Second, Google wanted to destroy header bidding because the innovation threatened Google's practice of trading on inside information. Secretly, Google's ad server shared competing bids on publishers' inventory with Google's ad buying tools (DV360 and Google Ads), thereby allowing those tools to use the information to win auctions. This is similar to a form of insider trading, whereby Google is the only one able to bid with knowledge of others' bids. As Google discussed the predicament internally, header bidding caused Google to "lose[] visibility" into the "prices on a per-competitor basis," which are "important data pieces of our own optimization."

191.   Finally, Google wanted to eliminate header bidding to foreclose competition with its publisher ad server monopoly. The companies involved with header bidding would have a foothold on a key function of Google's ad server: routing publishers' inventory to exchanges. With that, a major player like Amazon or Facebook using header bidding would be well-positioned to eventually compete directly with Google's monopoly ad server. Without control over publishers' inventory, Google would lose the ability to block exchange competition and tilt trading towards itself.

192.   Google discussed how competition was a problem and deliberated over what to do about it. Rather than compete with other exchanges on price or quality, Google adopted a long list of overt and anticompetitive acts with the express purpose to "kill HB."

///

///

///

///

**Google Creates An Alternative To Header Bidding That**

**Favors Google; Which Google Keeps Under Wraps**

193.   Google tried to eliminate competition from exchanges in header bidding by creating an alternative that secretly stacked the deck in Google's favor. Google's ad server started to let publishers route their inventory to more than one exchange at a time with a new program Google marketed as Exchange Bidding, later renamed to Open Bidding. However, Google secretly devised the program in a way to foreclose exchange competition and codenamed it "Jedi." Google measured Jedi's success not by financial targets or output increases, but by how much it stopped publishers from using header bidding.

194.   Google devised Exchange Bidding to exclude competition from exchanges in at least four ways. First, Google diminished the ability of non-Google exchanges to return competitive bids by further decreasing their ability to identify users associated with publishers' ad space in auctions. Header bidding let each exchange access a cookie on the user's page, which permitted those exchanges to recapture some information about the user's identity. Google's new program prohibited exchanges from directly accessing the user's page. As a result, they identified users in auctions even less often, causing them to bid and win less often.

195.   Second, Google foreclosed exchange competition by charging publishers an additional 5 to 10 percent penalty fee for selling inventory in a non-Google exchange. The fee made advertisers' bids through rival exchanges less competitive than advertisers' bids through Google's exchange—because Google's exchange did not pay the additional fee. As Google understood it, because publishers and advertisers measure an exchange's performance in part based on its take rate, this gave Google's exchange a "'moat' in performance" when competing against competing exchanges.

196.   Third, Google foreclosed exchange competition by forcing its publisher ad server customers to use Google's exchange. When publishers chose to route their

ad space from Google's ad server directly to multiple exchanges at the same time, Google's new program required them to route that inventory through Google's exchange, even if they did not want to do so.

197.    Fourth, Google foreclosed exchange competition by secretly rigging the Exchange Bidding program to let Google win. Google designed Exchange Bidding to provide Google's exchange a special "prioritization," which Google kept secret. Google made it so its own AdX exchange won publishers' inventory even over another exchange's higher bid.

### Google (and Facebook) Neutralize Header Bidding With An Unlawful Agreement Eliminating Competition From Facebook

198.    Google identified Facebook as a potential competitive threat in digital advertising before the rise of header bidding. Although Facebook explored building a full ad tech stack by acquiring companies in 2013 and 2014, it ultimately abandoned those efforts, recognizing that the industry was "subject to one bottleneck and intermediary—Google," which "own[ed] the last mile relationship with publishers."

199.    As advertiser demand saturated supply on Facebook's owned properties (i.e., facebook.com), Facebook sought additional inventory through its Facebook Audience Network ("FAN") ad network. FAN allowed Facebook's advertisers to extend campaigns off Facebook's apps onto third-party websites and apps.

200.    By 2017, FAN utilized header bidding to compete for this inventory. This allowed FAN to submit real-time, simultaneous bids for publishers' ad inventory using header bidding technology. Bypassing Google's ad server and exchange promised to reduce the substantial fees and taxes imposed on publishers and advertisers by Google's products.

201.    Facebook publicly announced in March 2017 that FAN would enable header bidding for open web publishers via its partnerships. The industry viewed

this as a significant competitive threat to Google's longstanding ad tech dominance. Trade publications like AdAge proclaimed Facebook was executing a "digital advertising coup against rival Google and its DoubleClick empire." Business Insider reported "Facebook made an unprecedented move to partner with ad tech companies – including Amazon – to take on Google."

202.   Facebook recognized the strategic implications of its 2017 header bidding announcement and adoption. Internal communications reveal it was an intentional signal to Google that Facebook was willing to support disintermediating header bidding technology. Facebook knew Google would view its header bidding participation as a major competitive threat capable of exposing and minimizing the significant revenue shares and fees Google extracts from publishers through its ad server's transaction "tax."

203.   Indeed, Google recognized the growth of FAN's header bidding as an "existential threat." FAN's enormous pool of advertiser demand made header bidding more attractive for publishers, which would reduce their dependence on DFP and AdX. According to yield metrics posted on Facebook's public blog, publishers partnering with FAN for header bidding were achieving 2-3x higher revenue per impression, with some seeing 10-30% total revenue increases. Google's management circulated and discussed these public blog posts internally as part of their monitoring efforts.

204.   Rather than improve its Open Bidding product to compete, Google sought a deal to bring FAN's demand into Open Bidding, away from header bidding auctions. Google concluded that bringing FAN demand into Open Bidding was a better alternative to slow publisher adoption of header bidding than "[a]ggressively mak[ing] [Open Bidding] much better than [header bidding]." Google also believe the plan would "dry out" header bidding's threat while allowing it to "build a moat around our demand" in the auctions it controlled.

205.   In 2018, after approvals from top executives like Sundar Pichai and

Mark Zuckerberg, Google and Facebook executed a "Network Bidding Agreement" ("NBA"). The NBA granted Facebook preferential terms, incentivizing Facebook to shift spend to Open Bidding through committed minimums and volume discounts.

206.   Within Google, employees referred to the NBA agreement using the code name "Jedi Blue" (as in "the Jedi Blue Agreement") as referenced above. Significantly, Google did not utilize code names for any other Open Bidding agreement. The use of this code phrase, kept secret internally, demonstrates the extraordinary nature and significance Google ascribed to its deal with Facebook, along with its keen desire to keep it secret and immune from scrutiny.

207.   The preferential terms Google granted to Facebook through the NBA included:

- **Price advantage** – Google charged Facebook a 10% fee (or as low as 5% after sufficient volume) instead of the standard 20% fee for ad networks on AdX.

- **Speed advantage** – Google extended the timeout for Facebook's bids to 300ms compared to 160ms for other partners, allowing more time for user recognition and bidding.

- **Direct billing** – Google permitted Facebook to maintain direct billing relationships with publishers, which Google prohibits for other ad networks.

- **Fraud detection** – Google informed Facebook which impressions were likely fraudulent so Facebook didn't have to pay for them.

- **Improved match rates** – Google agreed to use "commercially reasonable efforts" to help Facebook's FAN recognize the identity of users in publishers' and developers' auctions to help Facebook achieve 80% match rates for in-app and 60% for web inventory.

- **Restricting bid data use** – Google was prohibited from using Facebook's bid data to advantage itself against Facebook in auctions.

208.   In exchange for the advantages granted by Google, Facebook

1  committed to a substantial minimum annual spend requirement through Google's

2  Open Bidding program. Facebook was further incentivized to shift ad spend away

3  from header bidding alternatives through a tiered volume discount structure applied

4  across all of Facebook's Open Bidding spending.

5      209.  While the NBA's express terms were non-exclusive—Facebook still

6  had the contractual right to route demand through header bidding—both parties

7  recognized the agreement as *de facto* exclusive because the practical effect would be

8  to terminate Facebook's support for header bidding. According to internal emails,

9  Google CEO Sundar Pichai recognized the motive of the agreement was: "[f]or web

10  inventory, we will move [Facebook's] demand off of header bidding set up and

11  further weaken the header bidding narrative in the marketplace."  Confirming that

12  the NBA was actually exclusive, Facebook has not re-entered header bidding in the

13  7 years since the NBA was signed.   The "non-exclusive" provision was mere

14  window dressing.

15      210.  Internal documents form Facebook reveal that it also recognized the

16  effect of the deal would be to end its support of header bidding: "What Google

17  wants: To kill header bidding (us baptizing [Open Bidding] will help significantly)."

18  Facebook understood that the deal would "reduce our future optionality to build our

19  own ad tech and the likelihood of a newbie like Amazon[, which had introduced a

20  header bidding wrapper,] succeeding." Facebook's then-VP of Partnerships observed

21  that "by doing this deal, we will cement [Google's] position of power."

22      211.  Facebook's assessment that the NBA would "kill" header bidding,

23  reduce Facebook's "optionality," and "cement" Google's market power is not

24  consistent with an agreement that is truly non-exclusive, regardless of its terms. Nor

25  is it consistent with an agreement that forecloses anything less than a substantial

26  portion of ad spend to header bidding.

27      212.  After Facebook signed the NBA, Facebook effectively dropped its

28  support for header bidding. According to a public report in AdAge, "[o]ne ad tech

CEO, who met with Facebook when the social network was interested in developing a header bidding competitor to Google, says that the project mysteriously evaporated after Facebook seemed to fully embrace Google's Open Bidding play."

213.    Given the scope and extensive nature of cooperation between the two companies, Google and Facebook were highly aware that their agreement could trigger antitrust violations. So they discussed, negotiated, and memorialized how they would cooperate with one another should a government entity in the United States or globally start to investigate the agreement under antitrust laws. The NBA (aka the Jedi Blue agreement) permits the parties to terminate the agreement for regulatory inquiries, material document requests, a formal antitrust investigation, or a commenced antitrust action. If neither party executed those termination options, the agreement permits termination "immediately" after either party exhausts its right to appeal. The agreement also requires the parties to coordinate on antitrust defenses, such that Facebook must approve any and all arguments that Google presents relating to their illegal agreement in its answer to this Complaint. The word "antitrust" is mentioned no fewer than twenty times throughout the Jedi Blue agreement.

214.    Ultimately, by undermining header bidding as an alternative method for stimulating competitive bidding, Google's agreement with Facebook reinforced and preserved the monopoly power of its ad exchange, AdX.

**Google Deceived Competing Exchanges Into
Using Open Bidding Instead of Header Bidding**

215.    In its efforts to kill header bidding and competition in the exchange market, Google went further than colluding with its largest competitor. Google worked tirelessly to stop the innovation of header bidding entirely. Google deceived exchanges to use Google's ad server instead of header bidding. Google employees sometimes deceived publishers who chose to use header bidding, falsely telling one

major online publisher that it should cut off a rival exchange in header bidding because of a strain on servers.

216.  After the exchange uncovered Google's act, Google employees discussed playing a "jedi mind trick" on the industry and "get[ting] publishers to come up with the idea to remove exchanges … on their own." Google also crippled publishers' ability to measure the efficiency of exchanges in header bidding, limited publishers' use of exchanges in header bidding, and punished publishers and advertisers that used header bidding in Google search rankings, where Google has significant scale.

217.  Google first excluded competition from header bidding, and in the exchange market, by trading ahead of the bid orders submitted by header bidding exchanges. A publisher like Rumble would route their inventory to multiple exchanges through header bidding, then route the winning exchange bid into their Google ad server. Google programmed its ad server to let its exchange displace the winning header bidding exchange bid by paying one penny more. Put another way, Google's ad server allowed Google's exchange to peak at the winning header bidding exchange's bid, then displace the trade. Industry participants called this Google's "Last Look." Other industries call analogous conduct by intermediaries "insider trading" and "front running."

218.  With Last Look, and Google's absolute monopoly in the ad server market, Google successfully foreclosed competition in the exchange market and ensured a system where Google always prevailed. Google's exchange cherry picked the best impressions, leaving rival exchanges the low value impressions left behind by Google's exchange. According to a confidential Google study, Last Look significantly re-routed trading to Google's exchange and Google's ad buying tools, protecting Google's market power in both. Google's internal documents also explain that Last Look ensured that header bidding exchanges lose to Google's exchange. The exception was when a publisher set a higher floor for Google's exchange, a

feature that Google would later remove from publishers' control.

219. Google unlawfully excluded competition from header bidding and in the exchange market by tricking non-Google exchanges to migrate from header bidding to Exchange Bidding. In March 2017, Google stated that its exchange would no longer trade ahead of other exchanges that bid through Google's Exchange Bidding program. Market participants cheered Google for giving up its "Last Look auction advantage."

220. However, Google did not actually stop trading ahead of exchanges. Internal documents reveal that Google simply replaced one version of Last Look for another by using a new technique that allowed Google to continue to jump ahead of rival exchange bids. Specifically, Google deployed a bid optimization scheme based on predictive modeling. With this new bid optimization, Google abandoned Last Look as that term was understood. However, Google re-engineered its ability to trade ahead of its rivals.

221. Google's new manipulation permitted Google to give up Last Look, as such, but still win just the same—revenue neutral for DV360 (+2 percent) and Google Ads (-1 percent). Non- Google exchanges cannot compete with similar bid optimization schemes because Google's ad server restricts publishers from accessing and sharing their user IDs. Truly giving up Last Look would have cost Google too much; Google predicted a 10 percent hit to DV360's revenue and at least a 30 percent decrease in Google Ads' revenue.

222. Internal communications between Google employees reveal how Google engaged in deception to undermine header bidding and foreclose competition in the exchange market. In one instance, the OpenX exchange noticed their auction transactions and revenue in header bidding plummet. When OpenX reached out to a publisher to diagnose the problem, the publisher explained that Google employees told the publisher to remove the OpenX exchange from header bidding to solve a "strain on its servers" and improve the publisher's yield.

However, a senior Google employee worried its misrepresentations would make it difficult "to convince [companies] to trust us." Another employee conceded it gave Google a "bad look." Google employees agreed that, in the future, they should find ways to convince publishers to act against their interest and remove competing exchanges in header bidding on their own.

223.   Beginning in 2018, Google's ad server started redacting various data fields from the consolidated auction records it shared with publishers. These redactions make it nearly impossible for publishers to compare the relative performance of exchanges in header bidding with the performance of exchanges going through Google's ad server. Consequently, Google now renders the entire reason publishers use header bidding-increasing yield through head-to-head exchange competition-unobservable and unmeasurable.

224.   Google also throttles publishers' use of header bidding by capping the number of permissible "line items"—a feature in Google's ad server that publishers must use to receive bids from exchanges in header bidding. Many publishers requested that Google increase the number of permissible line items so that they could properly utilize header bidding. Internally, Google discussed charging publishers for increasing line items or keeping line items limits in place as "the only tool we have to fight [header bidding]." Google consistently rejected publishers' requests for more line items, or at best, would provide only temporary and limited increases. As one employee explained to others, "[w]e need to push these pubs to using Jedi – if imposing more limits pushes them more to Jedi – then we should keep those limits in place."

225.   In a competitive market, an ad server would help publishers use header bidding because it will better optimize publisher yield. The OpenX publisher ad server takes this approach, permitting publishers' liberal use of exchanges in header bidding. Instead of increasing line items to enhance publishers' yield, Google's ad server undermines its own clients' revenue yield.

**Google Excludes Competition Through "Nontransparent Pricing"**

226.   Google excludes competition by purposefully keeping its auction mechanics, terms, and pricing, opaque and "nontransparent." When marketing its exchange to publishers and advertisers, Google has explained that an ad exchange is "just like a stock exchange, which enables stocks to be traded in an open way." However, Google's exchange is not open at all.

227.   Google's non-transparent pricing strategy includes obfuscating the take rate that publishers and advertisers pay Google. Google tells the small advertisers who use Google Ads to bid the price they pay Google for ad space, but not the price the inventory actually cleared for in Google's exchange, the revenue the publisher receives, or the markup Google keeps. In a discussion between Google employees about Google Ads' fees, one employee asked: "Buyers don't know that [we] take a 15 percent fee? I didn't realize that." Another clarified that the fee "is not transparent." Even Google employees don't understand Google's fees for small advertisers.

228.   Google also obfuscates price transparency for publishers. Overall, evidence suggests that publishers selling inventory through Google receive approximately 70 percent of advertising revenue paid by advertisers, and in some cases that amount is as low as 58 percent. In other words, Google's take rate is approximately 30 percent and in some cases is as high as 42 percent.  In comparison, the nascent Rumble Advertising Center takes only 30% of the revenue.

229.   The lack of transparency decreases competitive pressure at different points in the supply chain and increases opportunities for rent-seeking and arbitrage. As one senior Google employee put it, "[b]y charging non-transparently on both sides, we give ourselves some flexibility to react and counteract market changes. If we face tons of pricing pressure on the buy-side, we can fall back on the sell-side, and vice-versa." In other words, Google can charge higher fees at points in the supply chain where there is little competition and the lack of transparency around

fees impedes other firms from coming in and competing with Google by offering the same services at lower prices.

230.   The lack of transparency also forecloses competition because it impedes potential and actual competitors from assessing a possible return on investment and entering the market to compete.

231.   Overall, the lack of transparency prevents more efficient competition that would drive greater innovation, increase the quality of intermediary services, increase output, and create downward pricing pressure on intermediary fees.

### Unified Pricing Rules: Google Excludes Competition In the Exchange and Ad Buying Tools Markets By Prohibiting Publishers From Setting Different Price Floors

232.   Many publishers, including Rumble, would prefer to apply higher price floors to Google's AdX exchange and ad buying tools than they apply to other exchanges, since the informational and other disadvantages Google creates for its exchange and ad buying tools often mean that AdX is willing to bid more than others. Those higher price floors for Google (or the lower price floors for others) require Google to compete more vigorously, i.e., bid more, for purchasing impressions. Publishers invested significant resources into determining and setting proper floors for different exchanges and buying tools. These efforts were designed to improve the revenue derived from ads as well as the quality of ads displayed on their pages.

233.   One of Google's initial efforts to avoid this heightened competition came in June 2019, when Google manipulated its core search algorithm to punish publishers utilizing higher price floors. It caused some publishers' search traffic to plummet, with one publisher losing half of its search traffic in a single day. Nevertheless, Google repeatedly misrepresented to publishers that it was not manipulating search traffic results to punish publishers who set higher price floors

Complaint

1   for Google. But ultimately, Google would address the issue more directly by

2   imposing Unified Pricing rules, which eliminated differential price floors altogether.

3   In effect, Google used its publisher ad server monopoly to enact a policy designed to

4   exclude competition in the exchange and ad buying tools markets.

5          234.   In 2019, Google's ad server started prohibiting publishers from setting

6   different price floors for different exchanges and ad buying tools. As a result,

7   publishers can no longer route their ad space to an exchange like AppNexus at a

8   price floor lower than the price floor they apply when routing the same impression to

9   Google's exchange. Nor can a publisher give one bidder (e.g., Google Ads) a higher

10   price floor (e.g., $10 CPM), while giving another (e.g., The Trade Desk) a lower

11   price floor (e.g., $8 CPM). Google calls these new ad server restrictions Unified

12   Pricing.

13          235.   Unified Pricing prohibits publishers from using price floors to generate

14   competition between Google and non-Google exchanges and ad buying tools or

15   increase their yield for valuable impressions. Historically, publishers set different

16   price floors for Google in order to generate competition from non-Google exchanges

17   and ad buying tools. After Google acquired DoubleClick, Google's ad server

18   restricted publishers from sharing their raw and non-scrambled DoubleClick ad

19   server users IDs with non-Google exchanges and ad buying tools. At the same time,

20   Google's ad server shares those user IDs with Google's exchange and ad buying

21   tools.

22          236.   Consequently, Google's exchange and ad buying tools had a distinct

23   information advantage about publishers' heterogenous inventory. Non-Google

24   intermediaries' corresponding information disadvantage caused them to bid lower

25   for impressions; for instance, they must sometimes bid "blind," unable to adequately

26   evaluate the value of the impression. To create bid competition in their auctions

27   from non-Google ad buying tools, publishers would set their price floors higher for

28   Google. But Google's Unified Pricing rules now block publishers from charging

Google a rational information risk premium, and they also effectively preclude publishers from generating competition from bidders unable to match Google's information advantages.

237.   Google's blocking of competition via Unified Price rules has resulted in Google's exchange and buy-side winning an increasing portion of publishers' impressions, even though they pay lower prices. Publisher auction records reveal that Google's exchange grew its share of exchange impressions by 20 percent after the introduction of Unified Pricing rules. For some publishers, the Unified Pricing restrictions caused their Google ad server to sell twice as much of their inventory to Google's exchange for half as much as what Google's exchange historically paid. Records also show that Unified Pricing rules result in Google's ad buying tools tripling and quintupling the share of impressions they win. In sum, Google used its monopoly in the ad server market to implement Unified Price rules that have been extremely effective at blocking and reducing competition from non-Google exchanges and ad buying tools.

238.   Unified Pricing rules not only prohibit publishers from discriminating between exchanges and bidders based on price and yield, but also on non-price criteria like ad quality. Publishers cannot favor exchanges and ad buying tools that return higher quality ads.

239.   The Unified Pricing rules also result in Google's exchange winning more because they coerce publishers to transact with Google ad buying tools in Google's exchange. In other words, they require publishers to use Google's exchange in order to do business with Google's ad buying tools. Previously, publishers could choose to transact with DV360 only in non-Google exchanges by increasing DV360's price floors in Google's exchange.

240.   Unified Pricing rules ended this practice and forced publishers to transact with DV360 and Google Ads in Google's exchange. Forcing publishers to transact with Google's ad buying tools only if they also transact in Google's

exchange was one of Google's main aims with Unified Pricing.

241.   Externally, Google falsely declared that abolishing price floors benefited publishers. Privately, however, Google recognized that Unified Pricing was "extremely self-serving" and revealed that the true objective was to allow "Google buyside and Facebook (after FAN integrates through Open Bidding) get access to the same 1st Price auction dynamics." According to an internal Google memorandum summarizing a May 2, 2019 meeting between Google and Facebook, the parties discussed publisher pricing floors, and Facebook told Google it would rather publishers not have the ability to set price floors. These discussions helped Google later decide to prohibit publishers from setting lower price floors for non-Google (or non-Facebook) exchanges, networks, and ad buying tools. The Unified Price rules further the collusion between Google and Facebook.

### Google Forces Advertisers To Use Google's Ad Buying Tools

242.   Google conduct that excludes competition in the exchange market also excludes competition in the ad buying tool markets.  The artificial information disadvantages that Google's ad server and exchange generate for non-Google ad buying tools (e.g., cutting off access to publishers' ad server user IDs) foreclose competition in the ad buying tool markets.

243.   The various Google programs discussed in paragraphs 140-164, including the Bernanke program, foreclose competition in the ad buying tool markets for small and large advertisers.

244.   Likewise, the Unified Pricing rules discussed in paragraphs 232-241 above foreclose competition and protect Google's monopoly in the ad buying tool markets. Before Unified Pricing, publishers could set different price floors to facilitate competition between Google and non- Google ad buying tools.

245.   Google's Last Look conduct, as well as Google's new replacement scheme, discussed in paragraphs 215-225, forecloses competition in the ad buying

1  tool markets.

2      246.   Google unlawfully maintains its monopoly power in the ad buying tool

3  markets by cutting YouTube inventory off from competing ad buying tools. Cutting

4  off YouTube access forces advertisers to use Google's ad buying tools because

5  YouTube, as the leading provider of video inventory in the United States, is a "must-

6  have" source of online instream video inventory for advertisers.

7      247.   Google did not always require advertisers to use a Google ad buying

8  tool to purchase YouTube ad inventory. Indeed, advertisers could previously

9  purchase YouTube inventory through many non-Google ad buying tools.

10      248.   However, in 2013, Google noticed that its ad buying tool for large

11  advertisers DV360 was falling behind the competition. Google started to consider

12  withholding YouTube inventory from non-Google ad buying tools for the express

13  purpose of pressuring advertisers to use DV360 and Google Ads. In an internal 2014

14  Google document, Google strategized that "[e]xclusivity of access to YouTube will

15  likely be a significant driver of DBM Video adoption."

16      249.   Google also recognized that withholding YouTube from competing ad

17  buying tools would give Google's DV360 and Google Ads power as buyers' agent

18  to steer advertisers' budgets back to Google's properties (e.g., Google Search). A

19  2013 strategy conversation makes this clear: "If advertisers feel like they don't have

20  to work with Google directly to access video inventory— including YouTube—we

21  will lose our ability to influence decisions about budget allocation." In other words,

22  if YouTube inventory were available exclusively through Google's ad buying tools,

23  advertisers would have to use those tools, which would empower Google to then

24  steer budgets back to Google properties (e.g., Search and YouTube).

25      250.   Rather than competing in the market on the basis of price or quality,

26  Google decided to withhold YouTube inventory from non-Google ad buying tools in

27  order to force advertisers to use Google's tools.

28      251.   The harm to competing ad buying tools is magnified because

COMPETITION &
TECHNOLOGY LAW
GROUP LLP

Complaint

advertisers (and ad agencies) prefer to minimize the number of ad buying tools they use. Advertisers and ad agencies bear significant costs and inefficiencies when using more than one ad buying tool for an ad campaign. For example, using multiple tools increases the rate at which they inadvertently bid against themselves on exchanges, thereby driving up their own advertising costs. As Google knows, advertisers can either use more than one ad buying tool (and increase their costs) or use just Google's tools and avoid these inefficiencies altogether.

252.   Cutting off access to YouTube foreclosed competition in the ad buying tool markets and protected Google's market power in these markets. Many DSPs stopped growing, many others went out of business, and the market overall has been closed to entry.

## X.  THE ANTICOMPETITIVE EFFECTS OF GOOGLE'S CONDUCT

253.   Google's exclusionary conduct has caused a wide range of anticompetitive effects, including the exit of rival firms and limited and declining entry rates in the relevant antitrust markets (despite the significant profits enjoyed by Google in those markets). Google's harm to competition deprives advertisers, publishers, and consumers of improved quality, greater transparency, greater innovation, increased output, and lower prices.

254.   Google's anticompetitive conduct described throughout this Complaint has adversely and substantially affected Rumble.

255.   Google has unlawfully maintained monopolies by using its market power to disadvantage the process of competition via tying, exclusionary conduct, and other conduct in at least the following ways:

  i.  Substantially foreclosing competition in the exchange market by interfering with and cutting off access to inventory and advertiser demand;

 ii.  Substantially foreclosing competition in the publisher ad server

market by tying its ad server with its market dominant exchange;

iii.  Substantially foreclosing competition in the market for publisher ad servers and using market power in the publisher ad server market to harm competition in the exchange market, the market for display ad buying tools for small advertisers, and the market for display ad buying tools for large advertisers;

iv.  Substantially foreclosing competition in the markets for display ad buying tools for small advertisers and display ad buying tools for large advertisers;

v.  Increasing barriers to entry in the markets for publisher ad servers, exchanges, display ad buying tools for small advertisers, and display ad buying tools for large advertisers;

vi.  Harming innovation which would otherwise benefit publishers, advertisers, and consumers;

vii.  Harming publishers' ability to effectively monetize their content, reducing publishers' revenues, and thereby reducing output;

viii.  Maintaining opacity on margins and selling processes, harming competition in the exchange and display ad buying tool markets;

ix.  Increasing advertisers' costs to advertise and reducing the effectiveness of their advertising, thereby harming businesses' ability to deliver their products and services and reducing output; and

x.  Improperly shielding Google's products from competitive pressures, thereby allowing it to continue to extract high margins and avoid the pressure to innovate.

256.  This section outlines the effect of Google's conduct on competition in the publisher ad server market, the exchange market, the market for ad buying tools for small advertisers, and the market for ad buying tools for large advertisers, as well as the effects on publishers, advertisers, businesses, and the general public.

**Anticompetitive Effects in the Publisher Ad Server Market**

257.   Google's exclusionary conduct has foreclosed competition in the publisher ad server market and created artificial barriers to entry and expansion. Google's exclusionary conduct in this market includes the tying of its ad server to its exchange (and network and ad buying tools), as well as its unlawful bid rigging agreement with Facebook. Competing publisher ad servers have consequently exited or significantly scaled back their offerings, leaving publishers with little to no choice but to license Google's ad server. Several large public advertising technology firms, including Microsoft, Yahoo!, WPP, and OpenX, once competed in this market; all four firms have since exited the market. Moreover, the entry of new competition has been remarkably weak for a decade, and new entrants are thwarted, because of the Google-created barriers to entry and expansion. For instance, Google thwarted Facebook's potential entry into this market by giving Facebook secret auction quotas.

258.   Google's harm to the competitive process has harmed customers in this market, *i.e.*, online publishers such as Rumble (and also Rumble's content creators).

259.   An ad server is an inventory management system that serves a publisher's interest. In a competitive market, publishers would benefit from ad servers competing on price and quality (e.g., the extent to which ad servers maximize publishers' inventory yield). Google's exclusionary conduct and entry barriers have permitted its ad server to charge supra-competitive fees (e.g., a 5 to 10 percent fee on gross transactions executed in non-Google exchanges and networks) and lower quality below competitive levels (e.g., blocking and interfering with competition from non-Google exchanges that increase publishers' yield).

260.   Google's harm to the competitive process in the ad server market has also harmed publishers' customers, i.e., individual consumers. Publishers like Rumble use revenue generated from selling ad space to improve the quality of their content, offer more content, and offer more subsidized content access (i.e., less

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

expensive subscriptions or free content access).  As mentioned above, in particular the illegal Jedi Blue Agreement and it impact almost forced Rumble out of business.

### Anticompetitive Effects in the Exchange Market

261.   Google's exclusionary conduct has foreclosed competition in the exchange market and created artificial barriers to entry and expansion. Google's exclusionary conduct in this market includes deceptively blocking, interfering with, and obstructing exchange competition, cutting off non-Google exchange access to publishers' user IDs, manipulating advertiser bids and exchange price floors (i.e., manipulating the auction), tying of its ad server to its exchange, ad network, and ad buying tools (requiring publishers and advertisers to trade in Google's exchange), an unlawful agreement with Facebook to rig publishers' auctions with advantages and quotas for Facebook, and a long list of conduct that Google pursued with the purpose to "kill" header bidding.

262.   Competing exchanges have consequently exited the market and new entrants like the Rumble Advertising Center are unable to effectively compete. Over ten years ago, Microsoft, Yahoo!, and top Silicon Valley venture funds competed in the exchange market, with the AdECN, AdBrite, and ADSDAQ exchanges; all three of these exchanges have since exited the market. Competition from new entrants has been weak because of the barriers and obstructions to entry Google has created. For instance, competing exchanges have tried for market share to compete by lowering their take rates to half and even a quarter of Google's exchange take rates. However, competition is not working: effectively, due to Google interference, lowering prices does not permit exchanges to gain market share.

263.   Google's harm to the competitive process has harmed customers in this market, i.e., online publishers and advertisers. In a competitive market, publishers and advertisers would benefit from exchanges competing on take rates and quality. Competition would lead to lower take rates, benefiting publishers and advertisers.

COMPETITION &
TECHNOLOGY LAW
GROUP LLP

Complaint

Publishers would retain a greater share of their advertising revenue, permitting them to create more content, higher-quality content, and more subsidized content access. Advertisers would pay less to purchase ad space, permitting them to re- invest those cost savings into providing consumers with higher-quality and lower-priced goods and services. Google's foreclosure of competition in the exchange market has permitted its exchange to charge supra-competitive fees (~19-22 cut on gross transactions) and lower quality below competitive levels. Furthermore, Google's high take rate does not reflect the magnitude of Google's anticompetitive harm because of the inefficiency Google creates in the allocation of impressions. Google has consequently reduced output in the exchange market.

### Anticompetitive Effects in the Network Market

264.   Google's exclusionary conduct has foreclosed competition in the display ad network market and the in-app mobile ad network market and created artificial barriers to entry and expansion. Google's exclusionary conduct in these markets includes Google Ads routing advertisers' bids on display ads to only Google's network, then deceptively re-routing those advertisers' bids to Google's exchange; it also includes the terms of the Jedi Blue agreement, which provide Facebook's in-app network FAN with "Win Rate" quotas in auctions for publishers' in- app inventory. Competing display and in-app networks have exited the market and new entrants are unable to effectively compete. Whereas competition in these markets used to be vigorous.  Today, Google and Facebook control these markets.

265.   Google's harm to the competitive process has harmed customers in this market, i.e., small publishers and advertisers. In a competitive market, small publishers and advertisers would benefit from networks competing with each other on take rates and quality. Competition would lead to lower take rates, benefiting publishers and advertisers. Small publishers would retain a greater share of their advertising revenue, permitting them to create more content, higher-quality content,

COMPETITION &
TECHNOLOGY LAW
GROUP LLP

Complaint

and more subsidized content access. Advertisers would pay less to purchase ad space, permitting them to re-invest those cost savings into providing consumers with higher-quality and lower-priced goods and services.

266.   Google's foreclosure of competition in the network market has permitted its display network GDN to charge high double-digit take rates exceeding 32 percent. Google's foreclosure of competition in the in-app network market, per the terms of the Jedi Blue agreement, allocates a minimum fixed percent of auctions for publishers' inventory to Facebook's in-app network FAN irrespective of how high other networks might bid in the same auctions. Market allocation through quotas subverts competition between networks for publishers' in-app inventory and fixes prices in the market. Consequently, Google reduces output in these markets.

**Anticompetitive Effects in the Markets for Display Ad Buying Tools**

267.   Google's exclusionary conduct has foreclosed competition in the ad buying tool markets for both small and large advertisers and created artificial barriers to entry and expansion. Google's exclusionary conduct in these separate markets includes the tying of its ad server to its exchange, ad network, and ad buying tools (requiring publishers and advertisers to trade in Google's exchange), cutting off non-Google ad buying tools' access to publishers' ad server user IDs, manipulating advertiser bids and exchange price floors (i.e., manipulating the auction), and the tying of YouTube with its ad buying tools. Consequently, competing ad buying tools have exited the market and new entrants are unable to effectively compete.

268.   Competition in the ad buying tool markets for small and large advertisers was once robust; today, Google Ads is effectively the only remaining choice for small advertisers wishing to purchase display ad space from exchanges. And many large advertisers have no choice but to use DV360 because they single home (to reduce bidding risk) and because DV360 has exclusive access to YouTube

1    ad inventory, which is a "must have."

2         269.   Google's harm to the competitive process has harmed customers in

3    these markets, i.e., both small and large advertisers. Ad buying tools, whether for

4    small or large advertisers, are supposed to advance advertisers' best interests (e.g.,

5    buying identical ad space for the lowest price). In a competitive market, advertisers

6    would benefit from ad buying tools competing on price and quality (e.g., the extent

7    to which the tools maximize advertisers' best interests).

8         270.   Google's exclusionary conduct has permitted its ad buying tool for

9    small advertisers to charge supra- competitive fees and lower quality below

10   competitive levels (e.g., charging non-transparent fees, manipulating advertisers'

11   bids to purchase ad space for higher prices trading on Google's exchange and

12   network, and arbitraging small advertisers' bids to extract higher fees). Similarly,

13   Google's exclusionary conduct has permitted Google's ad buying tool for large

14   advertisers to charge supra- competitive fees and lower quality below competitive

15   levels (e.g., the lack of adequate auditing of Google conflicts of interests and

16   fraudulent impressions). Google's conduct has consequently also lowered output in

17   these markets.

18        271.   Google's harm to the competitive process in the ad buying tool markets

19   has also harmed advertisers' customers, i.e., consumers. The fees advertisers would

20   save on ad buying tools and ad purchases in the absence of Google's anticompetitive

21   conduct would result in reduced deadweight costs that advertisers would ultimately

22   pass on to consumers. Consumers would benefit through better quality and lower

23   priced goods and services. Advertising also allows consumers to learn of the range

24   of competitors in a market, their prices, and the nature of the products and services

25   offered. When advertising effectiveness is reduced, competition between products

26   and services is reduced, and consumers are harmed.

27   ///

28   ///

**Google's Conduct Harms Innovation**

272. In each of the relevant product markets, Google's exclusionary conduct has resulted in harm to innovation. A critical example of this is how, for many years, Google's publisher ad server depressed publishers' inventory yields by blocking real-time competition from non-Google exchanges.

273. When publishers found a way to work around the restrictions imposed by Google's ad server using header bidding, publishers' yields jumped by 30+ percent, sometimes even over 100 percent. It was not until 2018, about 8 years after the invention of real-time bidding, that Google's ad server finally permitted publishers to route their inventory to multiple exchanges in real time. In other words, the lack of competition caused by Google's foreclosure of competition and entry permitted Google's ad server to get away with significantly depressing publishers' inventory yields for almost ten years.

274. Google's response to header bidding has further harmed innovation in the exchange and publisher ad server markets. Google has used its market power in the publisher ad server market and exchange markets to "kill" header bidding, rather than competing on the merits. Header bidding helped publishers make more money by enhancing exchange access to and competition for publishers' impressions. By crippling interoperability with this new and beneficial invention, Google stifles rather than promotes beneficial innovation in the market.

## XI.    CLAIMS

## <u>COUNT I</u> – MONOPOLIZATION IN VIOLATION OF SECTION II OF THE SHERMAN ACT, 15 U.S.C. § 2

275. Plaintiff Rumble repeats and realleges every preceding allegation as if fully set forth herein.

276. Google wrongfully acquired and unlawfully maintained monopoly power in the market for publisher ad servers, unlawfully acquired or maintained

monopoly power in the ad exchange market and ad network markets, unlawfully acquired or maintained monopoly power in the market for ad buying tools for small advertisers, and unlawfully acquired or maintained monopoly power in the market for ad buying tools for large advertisers.

277.   Google has willfully maintained and abused its monopoly in the ad server market and adjacent markets to, inter alia, restrict publishers from routing inventory to multiple exchanges, preferentially route publisher inventory to Google's exchange, provide Google's exchange exclusive access to high-value inventory, provide information advantages to harm competition, structure key aspects of the exchange market to minimize transparency, trade ahead of header bidding exchanges, use its data advantages to trade on inside information, deceive publishers to encourage them to disable header bidding, cripple publishers' ability to measure header bidding yield, reduce line item capabilities to impede header bidding, redesign how web content is presented to make header bidding incompatible, withhold data from header bidding, enter into agreements with horizontal competitors to entrench its monopoly position, and exclude competition through Unified Pricing.

278.   Google has used its economies of scale in search and search advertising to create and maintain a monopoly in the markets for ad buying tools and exchanges.

279.   Google has willfully maintained and abused its monopoly power in the instream online video advertising market to force advertisers to use Google's ad buying tools for both small and large advertisers.

280.   Plaintiff Rumble (and indirectly, its content creators) have sustained antitrust injury as a direct and proximate cause of Google's unlawful conduct, in at least the following ways: (1) substantial foreclosure of competition in the market for publisher ad servers, and the use of market power in the publisher ad server market to harm competition in the exchange market; (2) substantial foreclosure of competition in the exchange market via foreclosure of rivals' access to publisher

inventory and advertiser demand; (3) substantial foreclosure of competition in the markets for ad buying tools by the creation of information asymmetries and unfair auctions enabled by Google's market dominance in the publisher ad serving tools and exchange markets; (4) increased barriers to entry and expansion in the publisher ad server, exchange, and demand-side buying tools markets; (5) decreased and inhibited innovation by Rumble (and others), which would otherwise benefit Rumble (and its content creators), other publishers, advertisers, and competitors; (6) harm to Rumble's ability to effectively monetize their content (for its benefit and the benefit of its content creators), reductions to Rumble's and other publishers' revenues, reduced output, and the resulting harms to consumers; (7) reduced advertiser demand and participation in the market from opacity on margins and selling process, and harm to rival exchanges and buying tools; (8) increased advertisers' costs to advertise and reduced effectiveness of advertising, which thereby harms businesses' return on the investment in delivering their products and services, reduces output, and further harms consumers; (9) protection of Google's products from competitive pressures, thereby allowing it to continue to extract high margins while avoiding competitive pressures to innovate.

281.   For the reasons set forth above, Google has violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT II – ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION II OF THE SHERMAN ACT, 15 U.S.C. § 2

282.   Plaintiff Rumble repeats and realleges every preceding allegation as if fully set forth herein.

283.   As detailed above, Google has monopoly power, or at a minimum, a dangerous probability of acquiring monopoly power, in the relevant online display advertising markets, including the market for publisher ad servers, the ad exchange and ad network markets, and in the markets for ad buying tools for large and small

1 advertisers.

2      284.   Google has willfully, knowingly, and with specific intent to do so,

3 attempted to monopolize the relevant online display advertising markets, including

4 the market for ad servers, the ad exchange and ad network markets, and the markets

5 for ad buying tools for large and small advertisers.

6      285.   Google has attempted to monopolize the ad server market and adjacent

7 markets to, inter alia, restrict publishers from routing inventory to multiple

8 exchanges, preferentially route publisher inventory to Google's exchange, provide

9 Google's exchange exclusive access to high- value inventory, provide information

10 advantages to harm competition, structure key aspects of the exchange market to

11 minimize transparency, trade ahead of header bidding exchanges, use its data

12 advantages to trade on inside information, deceive publishers to encourage them to

13 disable header bidding, cripple publishers' ability to measure header bidding yield,

14 reduce line item capabilities to impede header bidding, redesign how web content is

15 presented to make header bidding incompatible, withhold data from header bidding,

16 and enter into agreements with horizontal competitors to entrench its monopoly

17 position, and exclude competition through Unified Pricing.

18      286.   Google has attempted to monopolize the markets for ad buying tools

19 and exchanges.

20      287.   Google has attempted to monopolize in the instream online video

21 advertising to force advertisers to use Google's ad buying tools for both small and

22 large advertisers.

23      288.   Plaintiff Rumble (and its content creators) have sustained antitrust

24 injury as a direct and proximate cause of Google's unlawful conduct, in at least the

25 following ways: (1) substantial foreclosure of competition in the market for

26 publisher ad servers, and the use of market power in the publisher ad server market

27 to harm competition in the exchange market; (2) substantial foreclosure of

28 competition in the exchange market via foreclosure of rivals' access to publisher

inventory and advertiser demand; (3) substantial foreclosure of competition in the markets for ad buying tools by the creation of information asymmetries and unfair auctions enabled by Google's market dominance in the publisher ad serving tools and exchange markets; (4) increased barriers to entry and expansion in the publisher ad server, exchange, and demand-side buying tools markets; (5) decreased innovation, which would otherwise benefit publishers, advertisers, and competitors; (6) harm to publishers' ability to effectively monetize their content, reductions to publishers' revenues, reduced output, and the resulting harms to consumers; (7) reduced advertiser demand and participation in the market from opacity on margins and selling process, and harm to rival exchanges and buying tools; (8) increased advertisers' costs to advertise and reduced effectiveness of advertising, which thereby harms businesses' return on the investment in delivering their products and services, reduces output, and further harms consumers; (9) protection of Google's products from competitive pressures, thereby allowing it to continue to extract high margins while avoiding competitive pressures to innovate.

289.   For the reasons set forth above, Google has violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

## **COUNT III – UNLAWFUL TYING IN VIOLATION OF SECTIONS I and II OF THE SHERMAN ACT, 15 U.S.C. §§ 1 and 2**

290.   Plaintiff Rumble repeats and realleges every preceding allegation as if fully set forth herein.

291.   Google's contractual arrangements and other conduct force publishers and others to use Google's ad server (DFP) if they use Google exchange (AdX).

292.   Google's DFP and Google AdX are separate products in separate markets.

293.   Google AdX has sufficient market power in the exchange market to coerce publishers and others to use DFP even if they would prefer not to do so.

294.   Google's tying arrangements affect a significant volume of interstate commerce and have the effect of substantially foreclosing competition in the publisher ad server market by virtue of reducing the number of publishers and others for whom other ad servers can effectively compete. Moreover, these tying arrangements allow Google to maintain supra-competitive prices for AdX that are ultimately passed on to publishers and others, who are also harmed by virtue of having fewer options available at lower prices because of Google's conduct.

295.   Google's tying arrangements have caused competing ad servers substantial damages as a direct and proximate cause of this unlawful conduct because Google has foreclosed other ad servers from competing for potential publishers and others and has deprived ad servers of other business for reasons having nothing to do with the merits of Google DFP or other ad server products.

296.   Google's contractual arrangements and other conduct force advertisers and others to use Google's ad buying tools, DV360 or Google Ads, if they seek to purchase ad inventory on YouTube.

297.   Ad inventory on YouTube and Google's ad buying tools (DV360 and Google Ads) are separate products in separate markets.

298.   YouTube has sufficient power in the online video inventory market to coerce advertisers and others to use Google's ad buying tools (DV360 and Google Ads) even if they would prefer not to do so.

299.   Google's tying arrangements affect a significant volume of interstate commerce and have the effect of substantially foreclosing competition in the ad buying tools markets by virtue of reducing the number of advertisers and others for whom other ad buying tools can effectively compete. Moreover, these tying arrangements allow Google to charge supra-competitive prices for ad buying tools that are ultimately passed on to advertisers and others, who are also harmed by virtue of having fewer options available at lower prices because of Google's conduct.

300.   Google's contractual arrangements and other conduct force advertisers and others to use Google's network (GDN) and Google's exchange (AdX), or at least to not use competing networks and exchanges, if they use Google Ads.

301.   Google Ads, Google GDN, and Google AdX are separate products in separate markets.

302.   Google Ads has sufficient power in the market ad buying tools for small advertisers to coerce advertisers and others to use Google GDN and Google AdX even if they would prefer not to do so.

303.   Google's tying arrangements affect a significant volume of interstate commerce and have the effect of substantially foreclosing competition in the network market and ad exchange market by virtue of reducing the number of small advertisers and others for whom other networks and exchanges can effectively compete. Moreover, these tying arrangements allow Google to maintain supra-competitive prices for GDN and AdX that are ultimately passed on to advertisers and others, who are also harmed by virtue of having fewer options available at lower prices because of Google's conduct.

304.   Google's tying arrangements have caused harmed Rumble and caused it to suffer substantial damages as a direct and proximate cause of this unlawful conduct because Google has foreclosed other networks and exchanges from competing for potential small advertisers and others, and deprived networks and exchanges of other business for reasons having nothing to do with the merits of Google's network or exchange products, and have allowed.

## <u>COUNT IV</u> – UNLAWFUL AGREEMENT IN VIOLATION OF SECTION I OF THE SHERMAN ACT, 15 U.S.C. § 1

305.   Plaintiff Rumble repeats and realleges every proceeding allegation as if fully set forth herein.

306.   Google, by and through its officers, directors, employees or other

representatives, entered into an unlawful agreement with its co-conspirator Facebook in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, in which they agreed to allocate display ad auction wins and to fix display ad prices, as described in this Complaint.

307.   Google's conduct is a *per se* violation that restrains trade and harms competition through an unlawful agreement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

308.   Google's anticompetitive acts have had harmful effects on competition and consumers, as well as on Rumble and its content creators.

## XII.   HARM TO RUMBLE AS TO EACH OF COUNTS I to IV

309.   Plaintiff Rumble repeats and realleges every proceeding allegation as if fully set forth herein.

310.   As a direct and proximate cause of Google's anti-competitive conduct as alleged above, both Rumble and its content creators have been financially damaged.

311.   The damages and injunctive relief being sought in the pending *Rumble Inc. v. Google* case mentioned above do not include any damages or relief that are being sought by this Complaint.

312.   There is no overlap of either the factual and legal basis for the Claims asserted in the two cases, nor in the recovery being sought.

313.   Google's conduct has directly and proximately harmed Rumble in several ways.  For example, but for Google's anticompetitive conduct which allowed it to skim a large portion of the advertising revenue derived from views of Rumble Videos on the YouTube platform that would have remained on that platform notwithstanding Google's self-preferencing YouTube in Google search, Rumble would have received more ad revenue.  For another example, as alleged above (paragraphs 34 and 35), the impact of the "Jedi Blue" Agreement on Rumble was

immediate and a substantial loss of revenue to Rumble, almost forcing it out of business.

## PRAYER FOR RELIEF

WHEREFORE, Rumble prays for judgment against Google as follows:

1.     that Rumble be awarded compensatory damages according to proof, and that those damages be trebled;

2.     that Rumble be awarded its attorneys' fees and costs;

3.     that Rumble be awarded pre- and post-judgment interest;

4.     that Google and its members, subsidiaries, dba's, divisions, affiliates, parents, successors, assigns, officers, agents, representatives, servants, and employees, and all persons in active concert or participation with them or any of them, be preliminarily and permanently enjoined from the unlawful anticompetitive conduct alleged above; and

4.     that Rumble have such other and further relief as this Court deems just and proper.

Dated:  May 13, 2024

Respectfully Submitted,
COMPETITION & TECHNOLOGY LAW
GROUP LLP


By:  /s/ Robert W. Dickerson, Jr.
        Robert W. Dickerson, Jr.
Attorneys for Plaintiff
RUMBLE CANADA INC.

*Additional Counsel for Plaintiff*

Mark Meador
*PHV to be filed*
Email: mark@kressinmeador.com
Brandon Kressin
*PHV to be filed*
brandon@kressinmeador.com
Kressin Meador Powers LLC
300 New Jersey Ave., Suite 900,
Washington, DC 20001
Tel: 202.464.2905

1

## DEMAND FOR JURY

2

3        Plaintiff Rumble hereby requests a trial by jury for all issues properly

4    submitted to a jury.

5

6    Dated:  May 13, 2024                    Respectfully Submitted,
                                             COMPETITION & TECHNOLOGY LAW
                                             GROUP LLP
7

8                                            By:   /s/ Robert W. Dickerson, Jr.
                                                   Robert W. Dickerson, Jr.
9                                            Attorneys for Plaintiff
                                             RUMBLE CANADA INC.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPETITION &
TECHNOLOGY LAW
GROUP LLP

Complaint