Justina K. Sessions (CA State Bar No. 270914)
FRESHFIELDS BRUCKHAUS DERINGER US LLP
855 Main Street
Redwood City, CA 94063
Telephone:  (650) 618-9250
Email:  justina.sessions@freshfields.com

Eric Mahr (*pro hac vice forthcoming*)
FRESHFIELDS BRUCKHAUS DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone:  (202) 777-4500
Email:  eric.mahr@freshfields.com

*Attorneys for Defendants*
*Google LLC and Alphabet Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

RUMBLE CANADA INC.,

Plaintiff,

v.

GOOGLE LLC and ALPHABET INC.,

Defendants.

Case No. 5:24-cv-02880-BLF

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Hearing Date: Requested Nov. 14, 2024
Time:          9:00 a.m.
Place:         Courtroom 3
Judge:         Hon. Beth Labson Freeman

## NOTICE OF MOTION

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on November 14, 2024 at 9:00 a.m., or as soon thereafter as this matter may be heard, either in Courtroom 3 of this Court, located at 280 South 1st Street, San Jose, California, or by videoconference or teleconference, Defendants Google LLC and Alphabet Inc. will move the Court for an order dismissing Plaintiff's Complaint. This Motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiff fails to plead facially plausible relevant antitrust markets, Plaintiff lacks antitrust standing, Plaintiff fails to plead anticompetitive conduct, and certain of Plaintiff's claims are untimely. The Motion is based upon this Notice; the accompanying Memorandum of Points and Authorities and exhibits; any reply memorandum; the pleadings and files in this action; and such other matters as may be presented at or before the hearing.

DATED:  August 1, 2024

**FRESHFIELDS BRUCKHAUS DERINGER US LLP**

By: */s/ Justina K. Sessions*
Justina K. Sessions (SBN 270914)
855 Main Street
Redwood City, CA 94063
Telephone:  (650) 618-9250
Email: justina.sessions@freshfields.com

Eric Mahr (*pro hac vice forthcoming*)
FRESHFIELDS BRUCKHAUS DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone:  (202) 777-4500
Email:  eric.mahr@freshfields.com

*Attorneys for Defendants Google LLC and Alphabet Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................. iv

TABLE OF TERMS AND ABBREVIATIONS ................................................................ vii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................. 1

   1.   The Complaint.............................................................................................. 1

   2.   Prior Proceedings ...................................................................................... 2

LEGAL STANDARD......................................................................................................... 3

ARGUMENT ...................................................................................................................... 3

I.     COUNTS I-III SHOULD BE DISMISSED BECAUSE RUMBLE HAS NOT PLAUSIBLY ALLEGED A RELEVANT MARKET ................................................... 3

   A.    Each alleged market fails because it is gerrymandered to include only transactions for display ads, without any plausible allegations as to why other advertising formats—such as video—should be excluded. ...................................................................................... 4

   B.    The alleged publisher ad server market is also facially unsustainable because it excludes in-house ad servers and other routing methods.......................................................................... 6

   C.    The alleged ad exchange market is also facially unsustainable because it excludes direct sales. 8

   D.    The alleged ad network market is facially unsustainable because it excludes direct sales. 9

   E.    The alleged ad buying tools markets are facially unsustainable because they exclude tools for purchasing ads on popular platforms like Facebook, Instagram, Pinterest, and TikTok........................................................................................................................................ 9

II.   THE AD-BUYING-TOOLS CLAIMS SHOULD BE DISMISSED BECAUSE RUMBLE DOES NOT ALLEGE THAT GOOGLE HAS MONOPOLY POWER OR A DANGEROUS POSSIBILITY OF ACHIEVING IT ................................................................................. 9

III.  ALL COUNTS SHOULD BE DISMISSED BECAUSE RUMBLE HAS NOT ALLEGED ANTITRUST INJURY ..................................................................................................... 10

   A.    Rumble was neither a consumer nor a competitor in the alleged markets.................... 11

   B.    Rumble's injuries were not caused by any anticompetitive acts or effects................... 13

IV.  RUMBLE DOES NOT ALLEGE ANTICOMPETITIVE CONDUCT ............................. 15

   A.    Count IV should be dismissed because Rumble's NBA claims add nothing to those that the MDL court has already dismissed.............................................................................. 15

   B.    Count III should be dismissed because Rumble has not stated a tying or monopolization claim based on the so-called tying conduct.............................................................................. 16

      1.    Alleged Google Ads–AdX Tie ................................................................... 17

ii

2.      Alleged DFP–AdX Tie ................................................................. 18

3.      Alleged YouTube–Ad Buying Tools Tie ..................................... 19

4.      Alleged Google Ads–GDN Conduct ........................................... 20

C.    Rumble's claims based on user ID encryption, RPO, and Exchange Bidding should be dismissed for the same reasons the MDL court dismissed similar claims. .............................. 21

1.      User ID encryption ..................................................................... 21

2.      Reserve Price Optimization ........................................................ 22

3.      Exchange Bidding ....................................................................... 23

D.    The new "nontransparent pricing" allegation does not state a claim. ........................... 24

V.    SEVERAL OF RUMBLE'S CLAIMS ARE UNTIMELY ................................................ 24

CONCLUSION ................................................................................................................ 25

DEFS.' MOTION TO DISMISS COMPLAINT
CASE NO. 5:24-CV-02880-BLF

1

**TABLE OF AUTHORITIES**

2

**Cases**                                                                                                      **Page(s)**

3

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP,*

4
    592 F.3d 991 (9th Cir. 2010)……………………………………………….......23

*Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns,*

5
    108 F.3d 1147 (9th Cir. 1997)………………………………………….……23

6
*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ……………………………………………………………3

7
*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*

8
    472 U.S. 585 (1985)………………………………………………………….21

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*

9
    459 U.S. 519 (1983)………………………………………………….…......11

10
*Atl. Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990) ………………………………………………………10

11
*Bayou Bottling v. Dr. Pepper Co.,*

12
    725 F.2d 301 (5th Cir. 1984)……………………………………………..…19

*Bell Atl. Corp. v. Twombly,*

13
    550 U.S. 544 (2007)…………………………………………………….....3

14
*Brantley v. NBC Universal, Inc.,*
    675 F.3d 1192  (9th Cir. 2012)………………………………………...…17

15
*California v. Sutter Health Sys.,*

16
    84 F. Supp. 2d 1057 (N.D. Cal. 2000)…………………………….…....7

*Christy Sports, LLC v. Deer Valley Resort Co.,*

17
    555 F.3d 1188 (10th Cir. 2009)…………………………………….……19

18
*Dreamstime.com, LLC v. Google LLC,*
    54 F.4th 1130 (9th Cir. 2022)……………………………………………24

19
*Forsyth v. Humana, Inc.,*

20
    114 F.3d 1467 (9th Cir. 1997), aff'd, 525 U.S. 299 (1999)………………………..7

*FTC v. Cardinal Health, Inc.,*

21
    12 F. Supp. 2d 34 (D.D.C. 1998)………………………………………...……6

22
*Hicks v. PGA Tour, Inc.*
    897 F.3d 1109, 1120 (9th Cir. 2018)…………………………………3, 4, 5, 6

23
*In re Google Dig. Advert. Antitrust Litig.,*

24
    2021 WL 2021990 (N.D. Cal. May 13, 2021)……...………….................3, 5, 8, 9, 23

*In re Google Dig. Advert. Antitrust Litig.,*

25
    627 F. Supp. 3d 346 (S.D.N.Y. 2022)………………………....…....3, 15, 16, 22, 23, 24

26
*In re Live Concert Antitrust Litig.,*
    247 F.R.D. 98 (C.D. Cal. 2007)…………………………………...............6

27

28

iv

*Lacey v. Maricopa Cnty.,*
    693 F.3d 896 (9th Cir. 2012)……………………………………….....7

*LiveUniverse, Inc. v. MySpace, Inc.,*
    304 F. App'x 554 (9th Cir. 2008)………………………………………23

*Marder v. Lopez,*
    450 F.3d 445 (9th Cir. 2006)…………………………………………15

*MetroNet Services Corp. v. Qwest Corp.,*
    383 F.3d 1124 (9th Cir. 2004)……………………………………………22

*Nat'l Ass'n of Pharm. Mf'rs v. Ayerst Labs.,*
    850 F.2d 904 (2d Cir. 1988)…………………………………………23

*Newcal Indus., Inc. v. Ikon Off. Sol.,*
    513 F.3d 1038 (9th Cir. 2008)……………………………...…….4

*NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.,*
    305 F. Supp. 3d 1065 (N.D. Cal. 2018)………………………………….....13

*Oliver v. SD-3C LLC,*
    751 F.3d 1081 (9th Cir. 2014)…………………………………….....24

*Olympia Equip. Leasing Co. v. Western Union Telegraph Co.,*
    797 F.2d 370 (7th Cir. 1986)……………….....………………………19

*Packaging Sys. v. PRC-Desoto Int'l,*
    268 F. Supp. 3d 1071 (C.D. Cal. 2017)………………...…………….…....17

*Paladin Assocs. v. Mont. Power Co.,*
    328 F.3d 1145 (9th Cir. 2003)………………………………….....16, 17

*Payment Logistics Limited v. Lighthouse Network LLC,*
    2018 WL 5311907 (S.D. Cal. Oct. 24, 2018)…………………………….…....8

*Rebel Oil Co. v. Atl. Richfield Co.,*
    51 F.3d 1421 (9th Cir. 1995)………………………………………….....13

*Reveal Chat Holdco v. Facebook,*
    471 F. Supp. 3d 981 (N.D. Cal. 2020)………………………….……..5, 10, 11, 13, 21

*Sahagian v. Genera Corp.,*
    2009 WL 9504039 (C.D. Cal. July 6, 2009)……………………...…………11

*Sidibe v. Sutter Health,*
    4 F. Supp. 3d 1160 (N.D. Cal. 2013)……………………………………........17

*Somers v. Apple, Inc.,*
    729 F.3d 953 (9th Cir. 2013)……………………………………….…..9

*Spectrum Sports, Inc. v. McQuillan,*
    506 U.S. 447 (1993)………………………………….......................9

*Stubhub, Inc. v. Golden State Warriors, LLC,*
    2015 WL 6755594 (N.D. Cal. Nov. 5, 2015)………………………….…………..5

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.,*
    512 F.2d 1264 (9th Cir. 1975)…………………………………….……..…..6

v

*United States v. SunGard Data Sys.,*
    172 F. Supp. 2d 172 (D.D.C. 2001)……………………………………..…………6
*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko,*
    540 U.S. 398 (2004)................…………………………………..……......20, 21, 24


**Statutes**

Sherman Act, 15 U.S.C. § 1……………………………………………………15
Sherman Act, 15 U.S.C. § 15b………………………………………..……...24

DEFS.' MOTION TO DISMISS COMPLAINT
CASE NO. 5:24-CV-02880-BLF

## TABLE OF TERMS AND ABBREVIATIONS

| Term | Definition |
|---|---|
| AdX | Google's ad exchange |
| Complaint or Compl. | Complaint for Damages and Injunctive Relief Due to Antitrust Violations Relating to Ad Tech, ECF No. 1 |
| DFP | DoubleClick for Publishers, a prior name for Google's publisher ad server |
| DSP | Demand Side Platform |
| DV360 | Display and Video 360, a method of buying display and video advertising, alleged to be an "ad buying tool for large advertisers" |
| GDN | Google Display Network, alleged to be "Google's network" |
| Google Ads | Method of buying ad inventory from Google Search, YouTube, and GDN, alleged to be an "ad buying tool for small advertisers" |
| MDL Advertiser Class Compl. | Consolidated Advertiser Class Action Complaint, *In re Google Digital Advertising Litig.*, No. 1:21-md-3010-PKC (S.D.N.Y. Dec. 2, 2022), ECF No. 399 |
| MDL Case | *In re Google Digital Advertising Litigation*, No. 1:21-md-3010-PKC (S.D.N.Y.) |
| MDL Publisher Class Compl. | First Amended Consolidated Class Action Complaint, *In re Google Digital Advertising Litig.*, No. 1:21-md-3010-PKC (S.D.N.Y. Dec. 5, 2022), ECF No. 408 |
| NBA | Network Bidding Agreement |
| RPO | Reserve Price Optimization |
| Rumble | Rumble Canada Inc. |

## INTRODUCTION

Rumble has pleaded itself out of its own Complaint.  In an unavailing effort to allege that Google has large market shares, Rumble gerrymanders its alleged relevant markets to include only one very specific advertising format and to exclude transactions for all other formats of advertising.  This is enough to doom the complaint, as it renders the market allegations facially implausible.  But it also creates another problem for Rumble:  Rumble transacts in video advertising, while its alleged markets are carefully drawn to exclude that very type of advertising.  Tellingly, Rumble never alleges that it used any of the Google products at issue in the complaint, nor any other products in any of the alleged relevant markets.  Thus, Rumble is neither a consumer nor a competitor in the markets it so narrowly tried to define.  This means that Rumble does not have antitrust standing to assert these claims.

Rumble does not belong in the current melee over Google's advertising technology.  It selectively copied allegations from other complaints that were filed many years ago, and on behalf of very different entities.  Rumble does not explain why it waited until May 2024—a month before the close of fact discovery in the MDL—to file a complaint that "closely mirror[s] several of those made in plaintiffs' complaints in the MDL Case."  *Id.* ¶ 3.  And what Rumble couldn't or didn't copy is telling, and demonstrates that its complaint should be dismissed.

## BACKGROUND

### 1.  The Complaint

Plaintiff Rumble "has operated an online video platform" where video content creators upload videos.  Compl. ¶ 16.  Rumble makes those videos available to websites or social media platforms, where advertising space is sold in conjunction with the videos.  *Id.*  "Rumble (and

1

its content creators) receive advertising revenue from the advertisements that are made available to viewers of the published content." *Id.* Rumble does not allege that it used a single one of the Google ad tech products at issue in the Complaint.

Despite characterizing itself as a "publisher" of *video* content and advertising, Rumble's complaint is focused on what it deems to be a different type of advertising: display ads or "image based ads on the internet." *Id.* ¶¶ 13, 16. By "internet," Rumble does not mean the entire internet, but only websites that are part of what other plaintiffs term "the open web." Those other plaintiffs describe the open web as "websites whose inventory is available via an exchange or network." MDL Advertiser Class Compl. ¶ 95; *see also* MDL Publisher Class Compl. ¶¶ 70-71. This excludes the advertising available on websites like Facebook, Amazon, Instagram, Pinterest, or TikTok. Rumble also excludes from its markets video ads, ads in mobile applications, and "direct" transactions, where advertisers buy ad space from publishers without going through an intermediary tool. Using these gerrymandered markets, Rumble then estimates Google's market shares based on only transactions for display ads on the "open web."

Rumble alleges that Google monopolized or attempted to monopolize these various alleged markets. With one addition ("non-transparent pricing"), *see* Compl. ¶ 227, Rumble copied its conduct allegations from other ad tech complaints.

## 2. Prior Proceedings

Several complaints that contain allegations that Rumble has now copied were filed in this Court and eventually consolidated into two cases: *In re Google Digital Advertiser Antitrust Litigation* and *In re Google Digital Publisher Antitrust Litigation*. Google filed a motion to dismiss the advertisers' complaint, which this Court granted with leave to amend. Among

2

other reasons, this Court held that the advertisers' alleged market that "excludes social-media display advertising and direct negotiations," was facially implausible. *In re Google Dig. Advert. Antitrust Litig.*, 2021 WL 2021990, at *3 (N.D. Cal. May 13, 2021) (Freeman, J.).

The cases in this Court were transferred along with others to a multi-district litigation before Judge Castel in New York.  The MDL court dismissed other plaintiffs' claims predicated on some of the same alleged conduct about which Rumble now complains, namely: the NBA with Facebook, encrypting user IDs, Reserve Price Optimization, and Exchange Bidding. *See In re Google Dig. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346 (S.D.N.Y. 2022).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  To do so, the complaint must make factual allegations sufficient to "raise a reasonable expectation that discovery will reveal evidence," *Twombly*, 550 U.S. at 556, that would "allow[] the court to draw the reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. at 678.  It is "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief,'" which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted).

## ARGUMENT

## I.   COUNTS I-III SHOULD BE DISMISSED BECAUSE RUMBLE HAS NOT PLAUSIBLY ALLEGED A RELEVANT MARKET

Rumble must plead a relevant antitrust market to state claims for monopolization, attempted monopolization, and for tying (Counts I-III). *Hicks v. PGA Tour, Inc.*, 897 F.3d

1109, 1120 (9th Cir. 2018).  A complaint may be dismissed under Rule 12(b)(6) if the market definition is facially unsustainable.  *Id.* at 1120.

A relevant market must include both a geographic and a product market.  *Id.*  A relevant product market "must encompass the product at issue as well as all economic substitutes for the product."  *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  "Including economic substitutes ensures that the relevant product market encompasses 'the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business.'"  *Hicks*, 897 F.3d at 1120 (citation omitted).

Rumble asserts five allegedly affected markets:  publisher ad servers, ad exchanges, ad networks, ad buying tools for "small" advertisers, and ad buying tools for "large" advertisers.[1] Compl. ¶¶ 55-118.  Each of these alleged markets is limited to transactions for display ads, or "image-based ads on the internet", *id.* ¶ 13, and excludes other types of digital ad transactions. But Rumble concedes that some of the excluded ad types compete with display ad transactions, and utterly fails to explain away competition from others.  This makes each of its markets facially unsustainable.

> **A.    Each alleged market fails because it is gerrymandered to include only transactions for display ads, without any plausible allegations as to why other advertising formats—such as video—should be excluded.**

Rumble has alleged narrow markets in order to artificially inflate Google's market shares.  One way in which it has done this is to restrict each alleged relevant market to only transactions relating to "image-based graphical ads shown alongside web content."  Compl. ¶

---

[1] Google does not concede that buying tools for alleged "small" advertisers and for "large" advertisers are distinct in any relevant way.

56. Each of Rumble's alleged relevant markets excludes transactions for every other format of advertising, even where the very same tools at issue are used to purchase other ad formats.

Rumble's restriction of the relevant markets to a single form of advertising runs counter to this Court's prior ruling on Google's motion to dismiss the putative advertiser class complaint. *See In re Google Dig. Advert. Antitrust Litig.*, 2021 WL 2021990, at *3. There, this Court agreed that a market which "excludes social-media display advertising and direct negotiations," as Rumble's alleged market likewise does here, was facially implausible. *Id.* Rumble's restriction of the market in this fashion is also contrary to the Ninth Circuit's decision in *Hicks*. In *Hicks*, the Ninth Circuit rejected a proposed relevant market of advertising between commercial breaks during professional golf tournaments, because it excluded numerous "economic substitutes," including both digital advertising ("advertising through a search engine or social media platform that provides advertisers insights on users' online history"), as well as non-digital advertising ("airing commercials during golf-related television programs, radio broadcasts, or podcasts," or "put[ting] its logo on a magazine ad, or on a wall in golf course clubhouses, or any number of other places"). 897 F.3d at 1121; *see also Reveal Chat Holdco v. Facebook*, 471 F. Supp. 3d 981, 1000 (N.D. Cal. 2020) (expressing "real concerns" over a "Social Advertising Market").

Here, Rumble pleads no facts to suggest that video advertising, search advertising, audio advertising, ads in mobile applications, or ads on social media platforms are not economic substitutes for image ads on websites. The Complaint contains no discussion whatsoever of the cross-elasticity of demand among advertising formats. Nor does Rumble plead any facts to suggest that publishers and advertisers would not switch to other ad formats if the price of transacting in image ads on websites increased. For example, Rumble pleads no

facts to suggest that advertisers would not buy more ads on social media websites if it became more expensive to buy ads on other websites.  The closest Rumble comes is to observe that video advertising tends to have higher prices than display advertising.  Compl. ¶ 115.  But "the scope of the relevant market is not governed by the presence of a price differential between competing products."  *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1274 (9th Cir. 1975); *Stubhub, Inc. v. Golden State Warriors, LLC*, 2015 WL 6755594, at *3 (N.D. Cal. Nov. 5, 2015) (alleged "price differential does not suffice to support the existence of two separate markets"); *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 128 (C.D. Cal. 2007) (holding that alleged price differential did not demonstrate cross-elasticity of demand between products).  Rumble's allegation of a price difference between video and display ads does not mean the two are not substitutes, because a mere price differential says nothing about cross-elasticity of demand.

### B. The alleged publisher ad server market is also facially unsustainable because it excludes in-house ad servers and other routing methods.

The relevant market for assessing Google's market power with respect to Google Ad Manager must include the products that have the actual or potential ability to take significant business away from Google Ad Manager.  *Hicks*, 897 F.3d at 1120.  But the Complaint fails to explain why the alleged market does not include the many significant publishers that employ their own in-house products and services to display advertisements on their own websites, rather than using third party products and services like those offered by Google.  "Courts have generally recognized that when a customer can replace the services of [an external product] with an internally-created [] system, this 'captive output' (i.e., the self-production of all or part of the relevant product) should be included in the same market."  *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 48 (D.D.C. 1998); *United States v. SunGard Data Sys.*, 172 F. Supp. 2d 172,

186 (D.D.C. 2001); *California v. Sutter Health Sys.*, 84 F. Supp. 2d 1057, 1068 (N.D. Cal. 2000) ("Internal or captive transfers of a product should be included in the market." (internal quotation omitted)).  The Complaint does not even acknowledge the possibility that publishers have built and could build their own ad serving capabilities, let alone explain why those in-house products are not economic substitutes for a third-party product.

The Complaint also suggests that header bidding might be a competitive product, yet utterly fails to address header bidding's relevance to the market.  A competing product will be in the market if it provides a relevant competitive constraint, even if it does not include every service or feature of the product at issue.  *See Sutter Health*, 84 F. Supp. 2d at 1067 (finding that product market included both full-range hospitals as well as niche hospitals that competed by providing only some hospital services); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1477 (9th Cir. 1997), *aff'd*, 525 U.S. 299 (1999), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) ("Specialty shops which offer only a limited range of goods are generally considered in the same market with larger, more diverse, 'one-stop shopping' centers.").  Here, the relevant ad server feature—at least for the purposes of assessing market power—is routing.  Rumble complains that "Google's ad server charges publishers for routing their inventory to exchanges and networks."  Compl. ¶ 65.  But it also says that "header bidding shifted routing from the ad server to the browser," replacing the routing function in Google's ad server.  *Id.*  ¶ 183.  Indeed, the Complaint asserts that header bidding competed with Google's ad server, claiming that "Google wanted to eliminate header bidding to foreclose competition with its publisher ad server monopoly."  *Id.* ¶ 191.  In light of Rumble's concessions that header bidding was an alternative to the routing functionality in Google's ad

server, it is facially implausible to exclude header bidding transactions from the relevant market without any additional explanation.

### C.    The alleged ad exchange market is also facially unsustainable because it excludes direct sales.

Rumble's alleged ad exchange market does not include any of the alternative ways that publishers and advertisers have to transact with each other.  The Complaint contends in conclusory fashion that ad exchanges are not "interchangeable with direct sales channels."  Compl. ¶ 76.  Yet it also specifically alleges that transactions in Google's ad exchange had an effect on the value of direct-sold ads, and that as a result "*advertisers re-allocated spending towards Google's exchange.*"  *Id.* ¶ 178 (emphasis added).  By Rumble's own allegations, there is cross-elasticity of demand between direct-sold ads and transactions in ad exchanges, yet direct sales are inexplicably not part of Rumble's market.

Rumble cannot exclude direct sales just by arguing that direct sales require effort or are only used by larger publishers or advertisers.  In *Payment Logistics Limited v. Lighthouse Network LLC*, the court rejected a similar argument, where the plaintiff claimed that direct connections between payment systems were not in the same market as payment interface systems because direct connections were typically used by larger, more sophisticated customers.  2018 WL 5311907, at *3 (S.D. Cal. Oct. 24, 2018).  The two connection methods shared the same relevant purpose—as direct and indirect sales do here.  *Id.*  In the absence of "facts supporting that there is no 'reasonable interchangeability of use' or sufficient 'cross-elasticity of demand,'" the court granted the defendant's motion to dismiss.  *Id.*  Here, because the Complaint alleges that direct and indirect sales channels compete with one another, the exclusion of direct sales is an impermissible restriction of the alleged ad exchange market in the same way this Court previously criticized.  *See In re Google Dig. Advert. Antitrust Litig.*,

8

2021 WL 2021990, at *3 ("The Court is particularly concerned that Plaintiffs' market excludes . . . direct negotiations.").

### D.   The alleged ad network market is facially unsustainable because it excludes direct sales.

The alleged ad network market fails for the same reason that the exchange market fails.  As discussed above, Rumble has pleaded no facts to suggest that direct sales—which is a means of "match[ing] publishers' ad inventory with advertisers"—do not belong in the same market.  Compl. ¶ 91.

### E.   The alleged ad buying tools markets are facially unsustainable because they exclude tools for purchasing ads on popular platforms like Facebook, Instagram, Pinterest, and TikTok.

"[A]dvertisers use ad buying tools to purchase advertising space."  Compl. ¶ 101.  But Rumble inexplicably excludes the ad buying tools to buy advertising space on walled-garden websites from its market.  Rumble alleges no facts to suggest that advertisers do not view placing an ad on one website (*e.g.*, ESPN) as interchangeable with placing an ad on a walled-garden website (*e.g.*, alongside sports content on Instagram).  Without any allegations that advertisers do not substitute among websites when looking to buy digital advertising, these markets are facially implausible for the same reason identified in this Court's prior opinion.  *See In re Google Dig. Advert. Antitrust Litig.*, 2021 WL 2021990, at *3.

## II.   THE AD-BUYING-TOOLS CLAIMS SHOULD BE DISMISSED BECAUSE RUMBLE DOES NOT ALLEGE THAT GOOGLE HAS MONOPOLY POWER OR A DANGEROUS POSSIBILITY OF ACHIEVING IT

A monopolization claim also requires allegations that the defendant has monopoly power.  *See Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013).  An attempted monopolization claim requires allegations of "a dangerous probability of achieving monopoly

power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  Rumble has not alleged that Google has the requisite market power for either claim.

*First*, Rumble makes no allegations whatsoever about Google's market power or even shares in the alleged market for ad buying tools for "large" advertisers.

*Second*, the paltry allegations regarding "small" advertiser buying tools are deficient.  Rumble does not identify any share that Google Ads has in the alleged market.  Instead, Rumble cites statistics about the proportion of purchases that Google Ads makes on Google AdX and GDN, Compl. ¶ 110, but neither AdX nor GDN is the proper denominator for a market-share calculation, as neither constitutes the alleged market for "small" advertiser buying tools.  Rumble's purported direct evidence of Google Ads' monopoly power is also unavailing.  Rumble alleges that the *ad exchange* "charges supra-competitive fees," *id.* ¶ 111, but that says nothing about whether Google Ads has monopoly power.  In particular, it says nothing about whether the advertisers using Google Ads have other alternatives.  Without any direct or indirect evidence of *any* market power whatsoever, all of Rumble's claims based on ad-buying tools markets fail.

## III.   ALL COUNTS SHOULD BE DISMISSED BECAUSE RUMBLE HAS NOT ALLEGED ANTITRUST INJURY

In addition to pleading relevant markets and the requisite market power, an antitrust plaintiff must also demonstrate antitrust injury.  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).  To plead antitrust injury, Rumble must show "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, . . . (4) that is the type the antitrust laws were intended to prevent, and (5) the injured party [is] a participant in the same market as the alleged malefactors."  *Reveal Chat*,

471 F. Supp. 3d at 997; *see also Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540-43 (1983) (no antitrust injury where plaintiff "was neither a consumer nor a competitor in the market in which trade was restrained" and where injury was too indirect and speculative).  "Naked assertions" of antitrust injury that are "devoid of further factual enhancement" are insufficient.  *Reveal Chat*, 471 F. Supp. 3d at 997.

### A.  Rumble was neither a consumer nor a competitor in the alleged markets.

Rumble fails to allege that it is or was a consumer in any of its alleged relevant markets.[2]  Where, as here, a plaintiff does not plead "specific facts detailing their alleged purchases, it is impossible to tell whether the Complaint plausibly alleges that they are market participants," which itself compels dismissal.  *Sahagian v. Genera Corp.*, 2009 WL 9504039, at *5 (C.D. Cal. July 6, 2009); *see also, e.g.*, *Reveal Chat*, 471 F. Supp. 3d at 997-98 (dismissing complaint because it failed to allege that "Plaintiffs participate in" the purported relevant market).  Despite limiting its markets to display ad transactions, Rumble does not allege that it transacted any display ads, instead suggesting that Rumble is somehow associated with video advertising.  *See, e.g.*, Compl. ¶¶ 16, 18 (describing "Rumble Videos").  Rumble also never specifically alleges that it used any of Google's ad tech tools at all, let alone that it used any of Google's ad tech tools—or any other ad tech tools—to buy or sell display advertising.

---

[2] Rumble alleges that "instream video advertising" is a relevant market but makes no claim based on harm to competition in that market, nor does it allege any conduct that allegedly affected that market, save for one inscrutable non-sequitur: "Google has attempted to monopolize in the instream online video advertising to force advertisers to use Google's ad buying tools for both small and large advertisers."  Compl. ¶ 287.

DEFS.' MOTION TO DISMISS COMPLAINT
CASE NO. 5:24-CV-02880-BLF

Each of Rumble's alleged markets is expressly limited to tools that facilitate transactions for image-based web display advertisements. Compl. ¶¶ 13, 56, 73, 90, 105. Rumble's alleged markets specifically *exclude* tools that facilitate transactions for video advertisements, which is precisely the kind of advertising that Rumble sells. As Rumble alleges, the "online instream ads" that might play "before, during, or after a Rumble Video," "[are] not interchangeable with other types of online advertising, like search or display advertising." *Id.* ¶ 115. Rumble never alleges that it bought or sold static web display advertisements. Given Rumble's insistence that video advertising is not in the same market as display advertising, and the absence of any allegation that Rumble transacted in display ads, Rumble lacks antitrust standing as a consumer in an alleged relevant ad tech product market.

Rumble also fails to allege that it was a competitor in any alleged relevant market. Rumble does not allege that it offers a display publisher ad server, a display ad exchange, an ad network, or display ad buying tools (for "large" or "small" advertisers). The only supposedly competitive product that Rumble offers is the "Rumble Advertising Center," described as an "exchange," *id.* ¶ 262, but there are no allegations that the Rumble Advertising Center has any of the features or functions that supposedly differentiate ad exchanges from other means of transacting advertising. Whereas exchanges allegedly "provide a real-time auction marketplace with the features unique to exchanges," *id.* ¶ 75, Rumble has not described any features of the Rumble Advertising Center at all, other than that it "operates in a transparent and fair way." *Id.* ¶ 88. Even if Rumble had plausibly alleged that the Rumble Advertising Center was some sort of ad exchange, there is no allegation that the Rumble Advertising Center competes in the very narrow alleged market consisting only of exchanges for *display ads*. Instead, the opposite is true: the Complaint states that the Rumble Advertising Center is

DEFS.' MOTION TO DISMISS COMPLAINT
CASE NO. 5:24-CV-02880-BLF

used for "video content advertising," *id.* ¶ 88—which places it outside of the alleged display-ad-exchange market.

In its zeal to copy the narrowly (and incorrectly) drawn markets alleged in other ad tech complaints, Rumble has pleaded itself out of court.  By excluding video advertising from the alleged ad tech markets, Rumble has also excluded itself and therefore lacks antitrust standing.

### B.  Rumble's injuries were not caused by any anticompetitive acts or effects.

Since Rumble fails to allege that it is a customer or competitor in any of the allegedly affected markets, it is unsurprising that Rumble also fails to allege causal antitrust injury.  "To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995).  Rumble makes just two specific allegations of harm to itself,[3] but neither establishes antitrust standing.

*First*, Rumble alleges that "but for Google's anticompetitive conduct which allowed it to skim a large portion of the advertising revenue derived from views of Rumble Videos on the YouTube platform that would have remained on that platform notwithstanding Google's self-preferencing YouTube in Google search, Rumble would have received more ad revenue."  Compl. ¶ 313.  This alleged injury—reduced revenue from videos that Rumble

---

[3] Allegations of harm to "[Rumble's] content creators" or to other publishers cannot support antitrust standing.  *See Reveal Chat*, 471 F. Supp. 3d at 998 (noting that plaintiffs must allege that they themselves have been injured); *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 305 F. Supp. 3d 1065, 1076 (N.D. Cal. 2018) (holding that plaintiff did not have antitrust standing based on allegations of harm to a non-party).

posted on YouTube—has nothing to do with any of the allegedly anticompetitive conduct in the complaint.  Rumble makes no antitrust claim in this complaint relating to "self-preferencing YouTube" in Google Search.  The only YouTube-related conduct that Rumble challenges is Google allegedly requiring advertisers to use DV360 or Google Ads in order to advertise on YouTube.  *See id.* ¶¶ 246-52.  But this, at most, supposedly leads to some harm to rival ad-buying tools, not any harm to Rumble.  To the extent that Rumble means to suggest that it would have made more money on the Rumble Videos "syndicated" to YouTube if non-Google ad buying tools could purchase from YouTube, that is entirely speculative and unconnected to any alleged reduction in competition in the alleged relevant markets for display (not video) ad buying tools.  Rumble makes no allegations about the rate at which Google shares revenue with YouTube partners, nor any about the rates that other ad buying tools charge for purchasing video ads, let alone allegations of what other ad buying tools would have charged for purchasing ad inventory on YouTube.  Rumble's reduced ad revenues on YouTube cannot have nothing to do with the allegedly anticompetitive conduct.

*Second*, Rumble claims that the NBA between Google and Facebook caused Rumble's "immediate and substantial loss of revenue" or almost "forc[ed] it out of business."  Compl. ¶ 313.  Rumble's argument seems to be that the Facebook Audience Network was bidding on Rumble Video advertisements using header bidding, Facebook Audience Network stopped using header bidding, and Rumble's advertising revenue declined.  *See id.* ¶¶ 32, 35.  As discussed further below, the NBA did not require Facebook to stop using header bidding.  *See infra* § IV.A.  As such, any purported injury was caused by Facebook's unilateral decision, and not by the NBA.  Moreover, this chain of causation is too attenuated.  Rumble does not suggest that header bidding was the *only* way that it could get bids from FAN's "enormous pool of

DEFS.' MOTION TO DISMISS COMPLAINT
CASE NO. 5:24-CV-02880-BLF

advertiser demand." Compl. ¶ 203. Rumble's injury, if any, is that Facebook refused to buy through Rumble's most preferred channel. That is not an antitrust injury.

## IV.   RUMBLE DOES NOT ALLEGE ANTICOMPETITIVE CONDUCT

### A.   Count IV should be dismissed because Rumble's NBA claims add nothing to those that the MDL court has already dismissed.

Rumble alleges that the NBA violated Section 1 of the Sherman Act. Rumble's claim is an abbreviated copy of prior plaintiffs' Section 1 claims relating to the NBA, all of which have been dismissed for the same reason: there is no plausible allegation that Google and Facebook agreed that Facebook would not participate in header bidding. As the MDL court held and as Rumble acknowledges, Compl. ¶ 209, "[t]he terms of the NBA do not expressly or by reasonable implication refer to or restrict Facebook's use of header bidding." *In re Google Dig. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 370; *see also id.* at 372 ("[T]he 48-page NBA does not touch upon or purport to restrict Facebook's use of header bidding"); Declaration of Justina K. Sessions, Ex. 1 (NBA) at ¶¶ 2.4(e), 6.8(a), 19.10. Indeed, the agreement explicitly "'does not restrict Facebook from developing or enhancing a product or service that competes with . . . [Google's] Program . . .'" *In re Google Dig. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 370; NBA ¶ 2.4(e). And "[i]t is 'not an exclusive agreement.'"[4] *In re Google Dig. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 370; NBA ¶ 19.10.

Rumble nonetheless argues that the agreement was "de facto exclusive." Compl. ¶ 209. But Rumble points to nothing in *the agreement* that had "the practical effect" of preventing Facebook from engaging in header bidding. *Id.* Facebook's alleged *recognition*

---

[4] The Court may consider the actual terms of the NBA on a motion to dismiss, as it is integral to the Complaint. *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

that the "effect of the deal would be to end its support of header bidding" is not the same thing as an agreement to end support of header bidding. *See In re Google Dig. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 372 ("Nowhere in these internal memos is there a hint that Facebook was offering a commitment to substantially curtail use of header bidding or that Google was insisting on such a commitment."). Nor does the allegation that Facebook "was . . . incentivized to shift ad spend away from header bidding," Compl. ¶ 208, equate to a requirement that Facebook do so. Although Rumble points to "a substantial minimum annual spend requirement," *id.*, like the other plaintiffs before it, Rumble "offers no context on the size of Facebook's annual spending on display ads," *In re Google Dig. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 373, and no allegations that the minimum spend requirement prevented Facebook from spending money through other means as well.

The allegations that Facebook obtained "preferential terms" do not support an inference that there was some separate, unwritten agreement between the parties. Rumble's suggestions of a secret agreement "are not plausible because they fail to adequately account for Facebook's motivation to use its economic clout as an advertiser to drive the hardest bargain it could with Google, and that Google was motivated by the legitimate, pro-competitive desire to obtain as much business as possible from Facebook." *Id.* at 371.

For these reasons, Count IV and any monopolization claim or attempted monopolization claim predicated on the NBA should be dismissed.

### B. Count III should be dismissed because Rumble has not stated a tying or monopolization claim based on the so-called tying conduct.

To state a tying claim, a plaintiff must first plead "that there exist two distinct products or services in different markets whose sales are tied together." *Paladin Assocs. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003). To satisfy this first prong, a plaintiff "must define

16

the relevant market for both the tying product and the tied product." *Packaging Sys. v. PRC-Desoto Int'l*, 268 F. Supp. 3d 1071, 1083 (C.D. Cal. 2017); *see also Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1174–75 (N.D. Cal. 2013) (dismissing tying claims for lack of plausible market definitions).  Second, a plaintiff must show "that the seller possesses appreciable economic power in the tying product market sufficient to coerce acceptance of the tied product." *Paladin Assocs.*, 328 F.3d at 1159.  Third, a plaintiff must show "that the tying arrangement affects a not insubstantial volume of commerce in the tied market." *Id.*  This requires a plaintiff to "plead facts showing [a] negative impact on competition in the tied markets." *Sidibe*, 4 F. Supp. 3d at 1178; *see also Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2012) ("actual adverse effect on competition" necessary to plead a tying claim).

### 1.  Alleged Google Ads–AdX Tie

Rumble alleges that, at one time, "Google refused to route [Google Ads] advertisers' bids to non-Google exchanges."  Compl. ¶ 126.  But then it acknowledges that "in 2016 Google started routing the bids of small advertisers from Google's buying tool to non-Google exchanges."  *Id.* ¶ 132.  These allegations do not state a tying claim.

*First*, Rumble does not allege that Google possessed market power in the alleged tying market (buying tools for "small" advertisers), for the reasons provided above.  *Supra* § II.  *Second*, Rumble does not allege that Google coerced Google Ads advertisers to bid into Google AdX exclusively.  In fact, Rumble acknowledges that Google Ads has bid into other exchanges since 2016.  Compl. ¶ 132.  *Third*, Rumble has made no allegations about the effects of the tie on the alleged display ad exchange market.  There are no allegations about the proportion of display-exchange transactions that were foreclosed.  Any suggestion that an

17

alleged partial exclusivity between Google Ads and Google AdX had a substantial effect on competition would be implausible, as Rumble alleges that there is lots of other advertising demand available to publishers and ad exchanges outside of Google Ads.  For one thing, in 2017, Facebook's ad network had an "enormous pool of advertiser demand" that bid on inventory in "third-party websites and apps."  *Id.* ¶ 203.  Also, "[s]ome of the biggest tech companies (including, *e.g.*, Amazon) participated in header bidding," which involved bidding into non-Google ad exchanges.  *Id.* ¶ 184.  And Rumble does not allege that "large" advertisers (*e.g.*, the ones that allegedly use DSPs) were required to use Google AdX.  The "large" advertisers who used "Amazon's DSP," The Trade Desk, or even Google's DV360 were free to use non-Google Ad exchanges.  *See id.* ¶ 239 (conceding that Google's DV360 bids into non-Google exchanges).  It is implausible that restricting a portion of the bidding of only certain "small" advertisers had a substantial impact on the display-exchange market overall.

For the same reasons, the Section 2 claims predicated on this conduct (within Counts I-II) should also be dismissed.

### 2.    Alleged DFP–AdX Tie

Next, Rumble asserts that Google tied DFP to AdX when "Google programmed its exchange to return real-time bids only to those publishers using Google's new publisher ad server."  Compl. ¶ 126.  Although similar claims brought by other plaintiffs have survived motions to dismiss, Rumble's allegations here fall distinctly and fatally short.  Rumble fails to allege that Google has sufficient economic power in the alleged tying product market (here, *real-time bids* from ad exchanges) sufficient to coerce acceptance of the tied product.  Rumble does not allege that real-time bids from AdX are so important to publishers that they are forced to use Google's ad server.  All that Rumble alleges is that "publishers are usually interested in

18

exchanges returning real-time bids for their inventory." *Id.* ¶ 129.  Publishers being "usually interested" in receiving real-time bids does not mean that it is an economic imperative that they receive them from AdX.  Indeed, publishers can access advertiser demand in other ways: from other ad exchanges (in real time or not), through direct deals, or ad networks.

Rumble has also failed to allege that this alleged tie foreclosed competition in the alleged ad server market.  Therefore the DFP-AdX tying claim in Count III should be dismissed, as should any Section 2 claims in Counts I-II predicated on this conduct.

### 3.  Alleged YouTube–Ad Buying Tools Tie

Rumble alleges that since 2015, Google's YouTube video advertising inventory can be purchased only through Google's ad buying tools, and that this harms competition in the ad buying tool markets.  *Id.* ¶¶ 246-52.  This is another complete mismatch between Rumble's allegations and the gerrymandered alleged relevant markets.  Whereas the advertising available for purchase on YouTube content is video advertising, Rumble alleges buying tool markets restricted to display ads.  Rumble provides no explanation for how the availability of *video ad* inventory has any effect on a market for *display ad* buying tools.

Market mismatch aside, Google simply has no obligation to make its own ad inventory (YouTube inventory) available to rival buying tools.  Just as Coke is not required to let Pepsi be sold in Coke vending machines, *Bayou Bottling v. Dr. Pepper Co.*, 725 F.2d 301, 304 (5th Cir. 1984), Google is not required to let others sell its ad inventory.  *See, e.g.*, *Olympia Equip. Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 376-80 (7th Cir. 1986) (no obligation to let rivals sell defendant's inventory); *accord, e.g.*, *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1194-96 (10th Cir. 2009) (resort owner not obligated to let third party continue to sell ski equipment on its premises); *see also Verizon Commc'ns Inc. v.*

19

*Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407-08 (2004) (no general antitrust duty to deal with competitors).  Rumble cannot rebrand a spurious duty-to-deal claim as a "tie" to escape dismissal.

　　For these reasons, the YouTube-ad buying tools tying claim in Count III should be dismissed, as should any Section 2 claims in Counts I-II predicated on this conduct.

### 4.   Alleged Google Ads–GDN Conduct

　　Rumble also asserts that "Google gained its monopoly in the market for ad buying tools for small advertisers in part . . . by requiring the use of Google Ads by any advertiser seeking to purchase ad space through GDN."  Compl. ¶ 124.  As an initial matter, this claim fails under Rule 12(b)(6) because Rumble fails to explain what this means or how this "requirement" is imposed.  Moreover, Rumble fails to plead several elements of a tying claim.  *First*, Rumble has failed to allege relevant markets for the tying product (ad networks) or the tied product (ad buying tools for "small" advertisers).  *See supra* § II.  *Second,* assuming, *arguendo*, that GDN and Google Ads are separate products, Rumble has not alleged that GDN has sufficient market power over advertisers to force them to purchase Google Ads.  It appears that Rumble intends to argue that advertisers want to buy the ad inventory available through GDN (even though the network, rather than the ad inventory, is identified as the tying product).  But Rumble's allegations that  GDN  reaches "more" advertisers and publishers than other ad networks says nothing about how much display ad inventory (rather than a raw count of publishers) is available through GDN and whether advertisers could buy the same or equivalent ad inventory elsewhere.  *Third*, Rumble has failed to allege that the alleged tie affected a substantial volume of commerce in the alleged small-advertiser-buying-tools market, as it failed to allege that any

proportion of "small" advertisers use Google Ads because they want GDN (as opposed to, *e.g.*, ads on Google Search, which Rumble contends draws advertisers to Google Ads).

For these reasons, the claim in Count III and the Section 2 claims predicated on this conduct within Counts I-II should also be dismissed.

### C.   Rumble's claims based on user ID encryption, RPO, and Exchange Bidding should be dismissed for the same reasons the MDL court dismissed similar claims.

#### 1.   User ID encryption

The MDL court dismissed similar allegations regarding encrypting user IDs.  This Court should reach the same result.

Rumble alleges that Google's ad server encrypts user IDs to prohibit sharing "unencrypted" IDs with publishers, competing exchanges, or competing ad-buying tools.  Compl. ¶ 143.  In order to allege anticompetitive conduct based on the withholding of information, Rumble must allege that Google had some duty to provide it.  *See Reveal Chat*, 471 F. Supp. 3d at 1000–01.  But such a duty exists only as a "limited exception," grounded in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), where "[t]he unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggest[s] a willingness to forsake short-term profits to achieve an anticompetitive end."  *Trinko*, 540 U.S. at 409.  The Complaint's allegations concerning user IDs do not fit within this exception because nowhere in the Complaint are non-conclusory facts alleged which show that Google sacrificed profits by encrypting user IDs.  Rumble baldly states that encrypting user IDs sacrificed DFP's profits, Compl. ¶ 148, but this allegation falls flat for two reasons.  *First*, the Complaint only links the encryption of user IDs to reducing the amount that advertisers using non-Google tools bid and thus *lowering publisher* revenue, *see id.*, but doesn't explain how

DFP revenue drops as a result.  *Second*, the Complaint itself explains how user ID encryption delivered greater profits to Google's ad exchange and ad buying tools by making those tools more attractive to advertisers and publishers than rivals' tools, *id.* ¶¶ 146-47, and therefore concedes that encrypting user IDs was profitable for Google as a whole.  Due to these failures, the Complaint does not "show that Google's decision to change course was 'irrational but for its anticompetitive effect,' as opposed to an immediately profitable business strategy."  *In re Google Dig. Advert.*, 627 F. Supp. 3d at 383 (quoting *Novell*, 731 F.3d at 1075); *see also MetroNet Services Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132-34 (9th Cir. 2004) (rejecting duty to deal claim where defendant "was not forsaking short-term profits . . . but rather was attempting to increase its short-term profits").

### 2.  Reserve Price Optimization

In a section devoted to Project Bernanke, Rumble briefly alleges that, through RPO, "Google manipulated advertiser buyers into paying inflated prices in order to make its exchange produce higher revenues for publishers compared to other exchanges."  Compl. ¶ 152.  According to Rumble, Google "dynamically adjust[ed] the price floors publishers had set in Google's exchange on a per-buyer basis depending on what Google knows a particular buyer will actually pay . . . forc[ing] advertisers in Google's second-price exchange auctions to pay the RPO floor set by Google as opposed to the amount actually bid by the auction's second-highest bidder . . . without disclosing the manipulation to the advertiser or the publisher."  *Id.*  This, in turn, "harmed other exchanges' ability to compete for publishers' valuable impressions."  *Id.*

The MDL court has already ruled that similar allegations fail to "describe anticompetitive conduct" because "antitrust laws generally do not provide that a market

participant's failure to be truthful about its own product deprives its head-to-head competitor of competition." *In re Google Dig. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 391-93 (citing *Nat'l Ass'n of Pharm. Mf'rs v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988)).  The Ninth Circuit has followed this reasoning.  *See Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns*, 108 F.3d 1147, 1151 (9th Cir. 1997).  The Court should similarly dismiss such allegations here.

### 3.  Exchange Bidding

The Complaint alleges that Google introduced Exchange Bidding "to eliminate competition from exchanges in header bidding by creating an alternative that secretly stacked the deck in Google's favor."  Compl. ¶¶ 193-97.  But even an alleged monopolist "'has no duty to help its competitors survive or expand when introducing an improved product design.'"  *In re Google Dig. Advert. Antitrust Litig.*, 2021 WL 2021990, at *5 (quoting *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1002 (9th Cir. 2010)).  Rumble does not allege facts showing that introducing Exchange Bidding coerced publishers to use Google's products or deprived them of any alternatives.  To the contrary, it concedes that Exchange Bidding gave publishers an *additional* way of transacting on rival exchanges by allowing them "to route their inventory to multiple exchanges in real time."  Compl. ¶ 273.  Introducing a new product (Exchange Bidding) that does not prevent customers from using a rival product (header bidding) is plainly not anticompetitive.  *See LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008).

The MDL court has already ruled that these allegations do "not plausibly allege that Exchange Bidding harmed competition in any market," observing that "[i]n the Complaint's telling, Exchange Bidding in an inferior alternative to header bidding, but participants in the

online ad market apparently remain free to participate in either, or both." *In re Google Dig. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 393-95.  This Court should rule so here, too.

### D.  The new "nontransparent pricing" allegation does not state a claim.

Rumble also claims that Google excludes some unspecified "competition" by engaging in "nontransparent pricing."  Compl. ¶¶ 226-31.  But Rumble identifies no reason that Google would have an antitrust duty to reveal any more information about its take rate.  Rumble suggests that "[t]he lack of transparency [ ] forecloses competition because it impedes potential and actual competitors from assessing a potential return on investment and entering the market to compete."  *Id.* ¶ 230.  Google has no duty to provide pricing information to competitors or otherwise assist them in "assessing a possible return on investment." *See, e.g.*, *Trinko*, 540 U.S. at 407 (recognizing that firms are not obligated to aid rivals).  Moreover, Rumble does not allege how "nontransparent pricing" "harms the competitive process" or "impair[s] the opportunities of rivals." *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022) (quotations omitted).  If anything, Google's alleged nontransparent pricing could be an advantage to competitors who might seek to win business by providing more information.  Most remarkably, Rumble seems to criticize Google for charging the same rates as the Rumble Advertising Center. *See* Compl. ¶ 228 (both Google and Rumble Advertising Center keep 30% of revenue).

### V.    SEVERAL OF RUMBLE'S CLAIMS ARE UNTIMELY

Sherman Act damages claims are subject to a four-year statute of limitations.  15 U.S.C. § 15b.  Courts also use the four-year limitations period to delineate "inexcusabl[e] delay[]" under the doctrine of laches for injunctive-relief claims. *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085 n.4 (9th Cir. 2014).  Each of the following claims is based on old, public, conduct:

DEFS.' MOTION TO DISMISS COMPLAINT
CASE NO. 5:24-CV-02880-BLF

- **Google Ads-AdX**.  Rumble alleges that "Google began to require that the small advertisers bidding through Google Ads transact in both its ad network and exchange" in 2009.  Compl. ¶ 122.  The limitations period expired in 2013.

- **YouTube-Ad Buying Tools**.  Rumble alleges that Google made YouTube inventory available to buy only through Google buying tools in 2015.  *Id.* ¶ 118.  The limitations period therefore expired in 2019.

- **User IDs**.  Rumble alleges that Google began "hashing or encrypting publishers' user IDs" in 2009.  *Id.* ¶ 143.  The limitations period expired in 2013.

- **DRS**.  Dynamic Revenue Share was also a public feature in place by 2014.  *Id.* ¶ 153.  The limitations period therefore expired in 2018.

- **Exchange Bidding**.  Google introduced Exchange Bidding at some point prior to March 2017.  *Id.* ¶ 219.  The limitations period therefore expired in March 2021.

## CONCLUSION

For the foregoing reasons, Google respectfully requests that this Court dismiss Rumble's Complaint.

Dated: August 1, 2024                            Respectfully submitted,

                                                 */s/ Justina K. Sessions*
                                                 Justina K. Sessions (SBN 270914)
                                                 FRESHFIELDS BRUCKHAUS
                                                 DERINGER US LLP
                                                 855 Main Street
                                                 Redwood City, CA 94063
                                                 Telephone: (650) 618-9250
                                                 Email: justina.sessions@freshfields.com

DEFS.' MOTION TO DISMISS COMPLAINT
CASE NO. 5:24-CV-02880-BLF

Eric Mahr (*pro hac vice forthcoming*)
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
700 13th Street NW, 10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Email: eric.mahr@freshfields.com

*Attorneys for Defendants Google LLC and
Alphabet Inc.*

DEFS.' MOTION TO DISMISS COMPLAINT
CASE NO. 5:24-CV-02880-BLF